**BARRY SERVICE AGENCY COMPANY, et al., Appellants,**

v.

**Earl L. MANNING, Commissioner of Finance, Respondent.**

**No. WD 48920.**

Missouri Court of Appeals, Western District.

Feb. 7, 1995.

---

Ted L. Perryman, St. Louis, for appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., Anne E. Schneider, Asst. Atty. Gen., Jefferson City, for respondent.

Before SPINDEN, P.J., and LOWENSTEIN and ELLIS, JJ.

ELLIS, Judge.

This is a case of first impression involving § 408.500, RSMo Supp.1993,[1] a statute regulating the interest rates and fees charged by Missouri lenders exclusively engaged in the business of making unsecured loans under $500 (hereafter referred to as "section 500 loans"). Appellants, who are eight registered section 500 lenders,[2] challenge a final judgment of the Circuit Court of Cole County denying them injunctive and declaratory relief from a state agency decision rendered without a hearing or other form of administrative review. Respondent (hereafter referred to as "the Director") is the Commissioner of Finance for the State of Missouri and serves as the Director of the Missouri Department of Economic Development's Division of Finance ("the Division"), an administrative agency responsible for licensing and regulating financial institutions and other types of consumer credit lenders operating within the state. We reverse the decision of the trial court and remand with directions.

Section 408.500 was enacted in July, 1990 and became effective on January 1, 1991. *See* House Bill No. 961, Laws of Mo.1990, pp. 1064–65. Prior to this statute, makers of unsecured small loans under $500 essentially had two options: charging the borrower a maximum interest rate of 2.218% per month on the unpaid principal balance under § 408.100(1), RSMo 1986,[3] or charging a flat $10 fee "[i]n lieu of" interest under § 408.031, RSMo 1986.

However, § 408.500 dramatically changed the legal landscape for lenders "exclusively in the business of making unsecured loans under five hundred dollars and who are not otherwise registered under chapter 408, RSMo." § 408.500.1. To begin with, it requires such lenders to register with the Director and pay a $300 annual registration fee. *Id.* More importantly, § 408.500 replaced the previous unsecured small loan system, which fixed the maximum interest rates and fees chargeable on such loans *by statute*, with a new approach:

> Lenders shall file a rate schedule with the director who, upon review, shall approve rates comparable with those lawfully charged in the marketplace for similar loans. In determining marketplace interest rates, the director shall consider the appropriateness of rate requests made by lenders and rates allowed on similar loans in the states contiguous to Missouri. If the director takes no action upon a filed rate schedule within thirty days of receipt, then it shall be deemed approved as filed. The director, on January first and July first of each year, shall consider the filing of new interest rate schedules to reflect changes in the marketplace.

*Id.* The remainder of § 408.500.1 prohibits makers of unsecured loans under $500 from charging, contracting for, or receiving interest payments or other fees in excess of this "approved rate" and gives the Director authority to promulgate rules regarding such loans, while § 408.500.2 voids any contract "evidencing any fee or charge" in excess of that rate. Section 408.500.2 also makes the reception or imposition of any such excessive fee or charge a class A misdemeanor.

---

1. Unless otherwise specified, all statutory references are to RSMo Supp.1993.

2. There were originally eleven plaintiffs in this suit, but three (Quality Financial Service, Main Enterprises, Inc. and Capitol F.S., Inc.) withdrew from the lawsuit prior to its submission.

3. This translates into an Annual Percentage Rate ("APR") of about 26.6%.

Shortly after § 408.500 was passed, the Division contacted regulators in each of the eight states contiguous to Missouri (namely, Arkansas, Kentucky, Iowa, Nebraska, Kansas, Tennessee, Oklahoma and Illinois) in an effort to obtain useful information about the rates allowed on unsecured loans under $500 in those states. When the data collection process was completed, various memoranda and spreadsheets containing the data were prepared and Division employees held several meetings with the Director to discuss and consider the information obtained.

The Division subsequently decided it would promulgate several emergency rules relating to section 500 loans and lenders. In late October, 1990, the Division sent preliminary drafts of these regulations to existing small lenders and solicited written comments concerning them. In a November 9, 1990 letter, appellants made several comments and attached copies of the rate schedules used by their affiliates in Oklahoma as examples of relevant "marketplace" rates. On December 11, 1990, just three weeks before § 408.500 was to go into effect, the Division formally promulgated three emergency rules, each with an effective date of January 1, 1991 and an expiration date of April 30, 1991. *See* 16 *Missouri Register* 7–9 (Jan. 2, 1991); § 536.025.4 (an emergency rule may only remain in effect for a maximum of 120 days). In particular, the Division promulgated Emergency Rule 4 CSR 140–11.030 (titled "Small, Small Loan Companies—Rates and Other General Provisions") at that time. 16 *Missouri Register* at 8–9. In the same issue of the *Missouri Register*, the Division also proposed a rule identical to Emergency Rule 4 CSR 140–11.030 on a "normal," non-emergency basis and sought public comments about it. *Id.* at 9, 22–23.[4]

Emergency Rule 4 CSR 140–11.030 contained a preamble labeled "PURPOSE" in which the Division declared its belief that:

The commissioner of finance is required by section 408.500, RSMo to establish rates and other terms for small, small loan companies (hereafter known as section 500 companies). The purpose of this rule is to set those rates and other general terms.

*Id.* at 8. The body of Emergency Rule 4 CSR 140–11.030(1) stated, in pertinent part, as follows:

(1) Maximum Rates. The maximum rate permissible on a loan made by a section 500 company shall be five percent (5%) of the amount financed per month. In addition to the five percent (5%) per month, ... a nonrefundable fee not to exceed ten dollars ($10) may be contracted for and collected on every section 500 company loan.

*Id.* at 9. Moreover, Emergency Rule 4 CSR 140–11.030(6) provided that rule violations were to be regarded as violations of § 408.500 and that violators would be "subject to the same penalties as provided in that section." *Id.*

On December 26, 1990, appellants submitted applications for certificates of registration as section 500 lenders, tendered checks for the $300 registration fee, and filed proposed rate schedules with the Director. The proposed schedules, which were used by their affiliates in Oklahoma, were copies of a rate chart published by the Oklahoma Department of Consumer Credit to determine maximum allowable interest rates and fees on unsecured loans under $500 as permitted by Okla.Stat. tit. 14A, § 3–508B (1990). The Director denied the rate requests on December 31, 1990, explaining that the rates sought were in excess of the maximum rate established in Emergency Rule 4 CSR 140–11.030(1) and warning appellants that the Division intended to enforce that limitation. He did, however, accept the checks and issue the requested certificates of registration.

On January 8, 1991, appellants challenged the validity of Emergency Rule 4

---

4. This process, which is known as "dovetailing," is expressly permitted by § 536.025.5 and is designed to allow the normal rule to become effective before the 120–day period during which the emergency rule is valid has elapsed. *See* Gary W. Duffy, *Administrative Rules and Rulemaking*, in 1 *Missouri Administrative Law* § 4.17 (2d ed. 1990 & Supp.1994).

CSR 140–11.030(1) by filing an action for declaratory judgment in the Circuit Court of the City of St. Louis styled *William Gordon Company v. Earl L. Manning,* case number 914–00003. While this suit was pending, appellants filed another set of proposed rate schedules based in large part on the Oklahoma rate charts submitted earlier. The Director determined that these schedules were "unacceptable" as well. After discovery and a hearing, on March 1, 1991, Circuit Judge Edward M. Peek ruled that since "[t]he language of Section 408.500 does not grant the Director of the Division of Finance, either expressly or by implication, the authority to set or establish" a maximum interest rate for unsecured small loans under $500, the Director exceeded his rulemaking powers when he promulgated Emergency Rule 4 CSR 140–11.030(1) and it was invalid.[5]

On April 4, 1991, appellants filed yet another set of proposed rate schedules based on the Oklahoma rate charts. This time, the rates were disapproved because the Director found they were "far higher than those found in the market as prescribed by Section 408.500 RSMo Supp. (1990)." Appellants then filed the action which is the subject of this appeal.

■ Judicial review of noncontested administrative decisions such as those made by the Director in this case[6] is governed by § 536.150, RSMo 1986. *State ex rel. Rice v. Bishop,* 858 S.W.2d 732, 734 (Mo.App.1993). In these cases, the circuit court does not use the competent and substantial evidence test employed in reviewing contested agency decisions. *Phipps v. School Dist. of Kansas City,* 645 S.W.2d 91, 94–95 (Mo.App.1982); *Bishop,* 858 S.W.2d at 736. Rather, it conducts a broader *de novo* review in which it hears evidence on the merits of the case, makes a record, determines the facts and

decides whether, in view of those facts, the agency's decision is unconstitutional, unlawful, unreasonable, arbitrary, capricious, or otherwise involves an abuse of discretion. *Phipps,* 645 S.W.2d at 95–96; *Karzin v. Collett,* 562 S.W.2d 397, 399 (Mo.App.1978); § 536.150.1. The circuit court owes no deference to facts found or credibility assessed by the agency and, likewise, need not conform doubtful evidence to the administrative decision. *Phipps,* 645 S.W.2d at 95, 96.

■ On appeal, we review the judgment of the circuit court, not the decision of the administrative agency. *Id.* at 100. Because we review its judgment essentially as we do other judgments declared in a case tried to the court without a jury, the scope of our review is governed by Rule 73.01 as construed in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). *Bishop,* 858 S.W.2d at 737; *Citizens for Safe Waste Management,* 810 S.W.2d at 641. Accordingly, we review the circuit court's judgment to determine whether its adjudication that the administrative decision was or was not unconstitutional, unlawful, unreasonable, arbitrary, capricious or the product of an abuse of discretion rests on substantial evidence and correctly declares and applies the law. *Bishop,* 858 S.W.2d at 737. In doing so, we may weigh the evidence before the circuit court when the record engenders a firm belief that the judgment is wrong. *Id.; Travers v. Board of Trustees,* 756 S.W.2d 623, 625 (Mo.App.1988). Of course, as always, questions of law fall within this court's province of independent review and correction. *Bradley v. Mullenix,* 763 S.W.2d 272, 275 (Mo.App.1988).

I.

■ In their first point, appellants allege the trial court erred in upholding the Director's refusal to approve their rate re-

---

5. The Director did not appeal this ruling and is collaterally estopped from re-litigating the issue in this suit. *See Sunshine Realty Corp. v. Killian,* 702 S.W.2d 95, 98–99 (Mo.App.1985).

6. *See Citizens for Safe Waste Management v. St. Louis County,* 810 S.W.2d 635, 641 (Mo.App.

1991) (characterizing an agency decision as noncontested if it is rendered without the requirement of an adversarial hearing, is not subject to administrative review, and determines the legal rights, duties or privileges of any person).

quests in that § 408.500 does not grant him any discretion but merely gives him ministerial authority to approve rates comparable to those lawfully charged in the marketplace for unsecured loans under $500. They point to the fourth sentence of § 408.500.1, which states that the Director, upon review of a proposed rate schedule filed with him, "*shall approve* rates comparable with those lawfully charged in the marketplace for similar loans." Thus, they reason, as long as a *section 500 lender's submitted rates are* "comparable" (that is, similar but not necessarily identical or equivalent[7]) to those charged in the marketplace, they must be approved by the Director.

▪ If this were all the statute said, we might agree. However, each part of a given statute must be read *in pari materia* with its other related parts. *Eureka Fire Protection Dist. v. Hoene,* 623 S.W.2d 79, 82–83 (Mo. App.1981). The very next sentence of § 408.500.1 states that in determining marketplace rates, the Director "shall consider the *appropriateness*" of the rate request made by the lender. Interpreting this language, the trial court found, and the Director argues on appeal, that the General Assembly intended to give the Director some discretion in the rate approval process because the statute specifically directs him to take into account the "appropriateness" of a lender's rate request in determining whether the request is to be approved. We agree.

The word "appropriateness" is a noun meaning the quality or state of being appropriate. *Webster's New Twentieth Century Dictionary* 91 (2d ed. 1983). As observed by the trial court, the plain meaning of the word "appropriate" when used as an adjective is "suitable," "proper," "fitting," or "necessary." *State ex rel. Pauli v. Geers,* 462 S.W.2d 166, 170 (Mo.App.1970). All these terms comprehend the exercise of some measure of judgment or discretion. Furthermore, as our

courts have stated in the official immunity context, "a ministerial function involves clerical duties which a public officer is required to perform upon a given state of facts, in a prescribed manner, in compliance of legal authority, without regard to the public officer's own judgment or opinion on the *appropriateness* of the act." *Clay v. Scott,* 883 S.W.2d 573, 576 (Mo.App.1994) (emphasis added). Thus, the Director's task in approving rate requests under § 408.500.1 is not purely ministerial in nature. Point denied.

## II.

Before we address appellants' second point, it is necessary to summarize the testimony of various witnesses concerning the rates allowed on unsecured loans under $500 in each of the eight states contiguous to Missouri.

### Arkansas

In Arkansas, all interest rates are constitutionally regulated and lenders can charge a maximum *yearly* interest rate equal to the Federal Reserve discount rate plus 5%, subject to an overall cap of 17% *per annum* on consumer loans. Bill Ford, Bank Commissioner for the State of Arkansas, testified that the maximum interest rate in Arkansas was approximately 8% *per annum* (or .75% per month) at the end of 1992.

### Kentucky

In Kentucky, the maximum interest rate on loans under $1000 is set by statute at 36% *per annum* (or 3% per month).

### Iowa

In Iowa, the maximum interest rate on loans of $1000 or less, 36% *per annum* or 3% per month, is set by the State Banking Board.

---

**7.** *See Wheeler v. Barrera,* 417 U.S. 402, 420, 94 S.Ct. 2274, 2284, 41 L.Ed.2d 159 (1974) ("comparable" does not mean "identical"); *Chemplex Co. v. Tauber Oil Co.,* 309 F.Supp. 904, 908 (S.D. Iowa 1970) (for two things to be "comparable," they need not be identical but must be similar); *Moorehead v. Department of Professional Regulation,* 550 So.2d 521, 522 (Fla.Dist.Ct.App.1989) ("comparable" means similar but not necessarily equivalent or the same).

## Nebraska

In Nebraska, the maximum rate on installment loans made by licensed lenders with unpaid principal balances under $1000 is 24% *per annum* (or 2% per month). These lenders are also allowed to charge a one-time "loan origination fee" of 7% of the amount of the loan under $2000.

## Kansas

In Kansas, a lender may charge an interest rate 36% *per annum* (3% per month) on that part of the principal balance up to $300 and 21% *per annum* (1.75% per month) on that part of the balance exceeding $300. Alternatively, a lender is allowed to contract for and receive a flat fee of up to $5 for loans of $75 or less and a fee of up to $7.50 for loans exceeding $75. Kansas also allows lenders to collect an "origination fee" of 2% of the amount of an unsecured loan under $500.

## Tennessee

In a September 12, 1990 memorandum to the Director, the Tennessee scheme regulating loans under $500 was described as being "[c]omplex to the point of being incomprehensible." Tennessee allows a "maximum effective interest rate" of 18% *per annum* (1.5% per month) on loans under $100 and 24% *per annum* (2% per month) on loans for $100 or more. These rates are denoted "maximum *effective* interest rates" because the lender can collect some of the interest (up to 7½% *per annum*) "up front" by deducting it from the cash actually delivered to the borrower. This practice is known as "discounting."[8] Lenders may also collect a "service charge," the amount of which is either a flat 4% of the amount financed or a fee varying with the amount of the loan,[9] at the lender's option. Furthermore, if the term of the loan is 90 days or more and the

monthly payment is at least $15, Tennessee allows lenders to charge a "maintenance fee" of $1.75 per month if the total loan amount is less than $100 and $2.75 a month if the total amount of the loan is at least $100 but no greater than $750. In addition, Tennessee allows small lenders to secure their loans by requiring collateral under the provisions of the Uniform Commercial Code or charging premiums and fees for various forms of insurance in addition to or in lieu of collateral. Robert Blake, the owner/operator of five licensed loan offices in Tennessee, testified that many of the loans under $500 made in Tennessee are secured either by traditional collateral or some form of insurance. Another witness testified that the interest rates charged for unsecured loans under $500 in Tennessee would undoubtedly be higher were security or collateral prohibited.

## Oklahoma

In Oklahoma, the maximum finance charge for an unsecured loan is computed on a sliding scale which also fluctuates with the Consumer Price Index. In addition to interest, permissible fees on unsecured loans greater than $80 include both a one-time "acquisition charge" and a monthly "installment account handling charge," both of which vary based on the term and amount of the loan. These rates are published annually by the Oklahoma Department of Consumer Credit, and there is no dispute that the rates submitted by appellants in April, 1991, were nearly identical to the published Oklahoma rates.

## Illinois

Illinois is the only state contiguous to Missouri where the rates charged on unsecured loans under $500 are totally unregulated. No maximum legal interest rate is set by statute for consumer loans under $10,000 and while consumer lenders must be licensed by the state, a licensed lender may charge what-

---

8. Missouri's section 500 lenders are not permitted to engage in "discounting." *See* 4 CSR 140–11.010(5).

9. On loans up to $20, the service charge is $2. On loans over $20 but less than or equal to $100, it is $2 plus 50¢ for each $5 borrowed over $20, while on loans over $100, the service charge is $10.

ever interest rate he and the borrower mutually agree to in their contract. Cecil Wyant, a Financial Institutions Examiner for the State of Illinois, testified that although the interest rates charged on such loans vary widely, the highest rate he encountered while performing audits of licensed lenders in his territory was an APR of approximately 200%. In a letter to the Director dated September 6, 1990, Lloyd Leheney of the Consumer Credit Division of the Illinois Department of Financial Institutions stated that he was also "aware of some interest rates being as high as 200% on loans under $500.00." Finally, Steven Geary, the Division's Associate General Counsel for Consumer Credit, testified that he had been informed by an Illinois regulatory official that unsecured loans of less than $500 were in fact being offered and accepted in Illinois at APRs as high as 180 to 200%.

A variety of witnesses testified that with the exceptions of Oklahoma, Illinois, and possibly Tennessee, lenders in the eight states contiguous to Missouri were making few if any unsecured loans under $500 because the statutorily-imposed (or, in Arkansas, constitutionally-imposed) maximum interest rates were so low as to be totally unprofitable.

With this information in mind, we now address appellants' second point, in which they claim the trial court erred in construing the term "marketplace" as used in § 408.500.1 to mean a geographical area where commerce could occur but is not necessarily taking place. Citing *Sitzes v. Raidt*, 335 S.W.2d 690 (Mo.App.1960), they argue that because the term "market" necessarily implies the existence of trade and the presence of competition, the maximum interest rates allowed in the contiguous states where unsecured loans under $500 are not in fact actively being offered and accepted are not "marketplace" rates as required by the statute and are therefore irrelevant. We disagree.

■ Statutory interpretation is a question of law. *Staley v. Missouri Director of Revenue*, 623 S.W.2d 246, 248 (Mo. banc 1981). When interpreting a statute, our primary role is to ascertain the intent of the General Assembly from the language used in the statute and, whenever possible, give effect to that intent. *Sullivan v. Carlisle*, 851 S.W.2d 510, 512 (Mo. banc 1993). In determining legislative intent, the words used in the statute are to be considered in their plain and ordinary meaning. *Trailiner Corp. v. Director of Revenue*, 783 S.W.2d 917, 920 (Mo. banc 1990).

It is readily apparent that a proper definition of the key term "marketplace," which is used three times in § 408.500.1, is essential to a correct interpretation of the statute. The trial court defined the term from a dictionary as follows:

> For purposes of Section 408.100 [sic], this Court construes the term 'marketplace,' when raised in isolation, to mean a geographical area where commerce and trade take place. This does not mean that any specific type of trade is actually taking place in the 'marketplace'; rather, the 'marketplace' is where the commercial activity would occur.

■ The General Assembly provided no explicit definition of the term "marketplace," and we have found no Missouri case defining it. The term is therefore to be accorded its plain and ordinary meaning as found in the dictionary. *Asbury v. Lombardi*, 846 S.W.2d 196, 201 (Mo. banc 1993); *Kansas City Star Co. v. Fulson*, 859 S.W.2d 934, 939 (Mo.App. 1993).

■ The word "marketplace" is sometimes defined as a place where buying and selling take place. *See, e.g., Collins COBUILD English Language Dictionary* 889 (1988). It is likewise declared to be "an open space . . . where goods are shown for sale" or a physical place where goods are offered for sale. *Webster's New Twentieth Century Dictionary* 1102 (2d ed. 1979); *Webster's New World Dictionary* 828 (3d College ed. 1988). More broadly, it is defined as "the commercial world; the realm of business, trade and economics." *The Random House Dictio-*

*nary of the English Language* 1177 (2d ed. 1993). These definitions are consistent with the trial court's determination that the word "marketplace" as used in § 408.500.1 refers to the geographic area where commercial activity does or could occur. More importantly, they are consistent with the particular context in which the General Assembly used the term. "The meaning of a term used in a statute cannot be determined independent of the particular context in which it is used and the subject matter under discussion." *Household Fin. Corp. v. Robertson,* 364 S.W.2d 595, 602 (Mo. banc 1963). Section 408.500.1 expressly declares that in determining whether a lender's proposed interest rates are comparable to those lawfully charged in the marketplace for similar loans, the Director "shall consider the.... rates allowed on similar loans in the states contiguous to Missouri." It is therefore apparent that as the term is used in § 408.500.1, the geographic area constituting the "marketplace" is the area comprising the eight states contiguous to Missouri.

■ Finally, the trial court's interpretation is consistent with the legislative purpose underlying § 408.500. It must be remembered that prior to adoption of § 408.500, Missouri lenders making unsecured small loans under $500 could only charge borrowers either a maximum interest rate of 26.6% *per annum* on the unpaid principal balance or a one-time flat fee of $10 in lieu of interest. Steven Geary testified that before § 408.500 was enacted, there were only "maybe ten or so companies" in Missouri making unsecured loans, all of whom offered only "very, very small loans" and charged the flat $10 fee. In enacting § 408.500, the General Assembly clearly desired to make unsecured loans under $500 more available to those Missouri citizens needing them. On the other hand, it also desired to afford some regulatory protection to borrowers and to discourage so-called "loan sharking" activities. So while § 408.500 was intended to allow greater latitude and flexibility in the rates lenders charge borrowers for unsecured loans under $500, the General Assembly did not completely abandon the traditional stance of regulating those rates. Had it intended for section 500 lenders to be able to charge any interest rate they chose, as is done in Illinois,[10] § 408.500 would have been unnecessary except to require that lenders register and pay a licensing fee. The General Assembly did not choose that option, but instead wisely steered a middle course between total deregulation and absolute rate uniformity. Accordingly, contrary to appellants' argument that the "marketplace" as used in the statute includes only those areas where unsecured loans under $500 are in fact actively being offered and accepted (that is, Oklahoma, Illinois and possibly Tennessee); we conclude that "marketplace" as used in § 408.500.1 refers to an eight-state geographic area where such loans can or could be made.[11] Point denied.

### III.

In their third point, appellants contend the trial court erred in finding that the Director did not act arbitrarily and capriciously in determining that their proposed rates were "inappropriate." They argue that the Director did not sufficiently identify the factors he uses to determine "appropriateness" and articulated no reasonable factual or logical basis for disapproving their proposed rates as being "too high" to be "appropriate."

---

**10.** We may presume that the legislature acted with full awareness and complete knowledge of the existing state of the relevant law in the area affected by the legislation. *See State v. Rumble,* 680 S.W.2d 939, 942 (Mo. banc 1984). This would, of course, include the laws and regulations (or lack thereof) pertaining to unsecured loans under $500 in the eight states contiguous to Missouri.

**11.** We do not mean to say that the dearth of unsecured loan activity in Arkansas, Kentucky, Iowa, Nebraska, and Kansas should be totally ignored in determining whether or not a particular lender's proposed rate schedule is to be approved. Judging from the purpose of § 408.500, the fact that there is essentially no unsecured lending activity in those states would tend to suggest that moderately higher interest rates for unsecured loans under $500, such as those permitted in Oklahoma, might well be "appropriate."

■ The Director testified that the two factors he considers in determining if a proposed rate is "appropriate" are (1) affordability—whether borrowers can afford to pay it (i.e., whether they would willingly choose to borrow at the rate) and (2) profitability— whether it allows lenders to make a fair and reasonable profit. Geary acknowledged that appellants' proposed rates met these criteria, but testified that in the Director's estimation, they were nevertheless "too profitable" and "[a]s a result, inappropriate." With regard to this argument, the trial court correctly observed that "consideration of appropriateness is a matter placed within the discretion" of the Director. It then found that appellants were not entitled to relief because they had failed to meet their burden to specify how the Director had abused that discretion or acted arbitrarily or capriciously. We disagree because there is absolutely no evidence in the record from which the trial court could find that the Director made his decision on the basis of anything other than surmise, .guesswork, or a "gut feeling." Moreover, the record demonstrates that appellants did indeed meet their burden to show that the Director acted arbitrarily, capriciously and unreasonably in determining that their rates were "inappropriate."

■ At the outset, we observe that an administrative agency acts unreasonably and arbitrarily if its findings are not based on substantial evidence. *Edmonds v. McNeal*, 596 S.W.2d 403, 407 (Mo. banc 1980); *Blackwell v. City of St. Louis*, 726 S.W.2d 760, 763 (Mo.App.1987). Moreover, an agency which completely fails to consider an important aspect or factor of the issue before it may also be found to have acted arbitrarily and capriciously. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). The fact that the legislature has vested discretion in an administrative official does not preclude a reviewing court from determining whether his findings were made or he otherwise acted in an unlawful, unconstitutional, arbitrary, capricious, unreasonable or abusive manner. *Kehr v. Garrett*,

512 S.W.2d 186, 191 (Mo.App.1974); *State Bd. of Registration for the Healing Arts v. Finch*, 514 S.W.2d 608, 614 (Mo.App. banc 1974). Nor does § 536.150.1, RSMo 1986, which withholds from a reviewing court the prerogative to "substitute its discretion for [the] discretion legally vested in [an] administrative officer or body." *Phipps*, 645 S.W.2d at 95, 96 n. 1; *see also Finch*, 514 S.W.2d at 618 (Pritchard, J., concurring).

With these principles in mind, we now review the evidence before the trial court. As to the first factor, affordability, the Director presented no evidence whatsoever that people could not afford or would not willingly choose to borrow money at appellants' rates. In fact, the only evidence was to the contrary. K. Christopher Doehring, general manager of a bookkeeping company for the loan offices operated by appellants, testified that appellants' 41 affiliates in Oklahoma had plenty of customers willingly paying the rates forwarded to the Director in November, 1990 and April, 1991. Furthermore, the Director's Associate General Counsel for Consumer Credit, Steven Geary, acknowledged that appellants' rates were affordable.

As to the second factor, when asked what he would consider a "reasonable or fair profit" for a section 500 lender in Missouri, Geary agreed that one should have a target rate of return in mind and hazarded a guess of 2% per month of the net assets, but warned he had no real basis upon which he could determine a fair profit margin and had received no such guidance from the Director. Asked the same question, the Director explained that it would be impractical to set a specific "reasonable" rate of return because business practices varied so extensively among lenders, including the type and number of loans being made and the amount of care taken to select customers. He said that while he had no precise figure or range of figures in mind, he nevertheless thought that the rates he had already approved allowed Missouri's section 500 lenders, including appellants, to make a fair profit.

On the other hand, according to a summary of the financial statements prepared by

their accountant, James Martin, in 1991 all eight appellants suffered net losses ranging from $8,313.00 to $48,498.00. In 1992, three again suffered net losses [12] and the other five had relatively meager net profits of from $735.33 to $34,737.75.[13] Martin stated that the "management fees" several appellants paid to a company called Consolidated Investment "could be substantial," but that he did not have the amounts on hand. Also in 1992, appellants closed two offices (one in Kansas City and one in St. Louis) and moved their Joplin office to Miami, Oklahoma because they were not profitable. Furthermore, in both 1991 and 1992, appellants charged the highest rate the Director had approved for use by any section 500 lender— $10 plus 5% per month on the amount financed. In contrast, Doehring testified that in Oklahoma, appellants' affiliates all realized a 10% or better profit margin. He said appellants could "make a profit" in Missouri as well if they were allowed to charge the rates permitted in Oklahoma.

Geary did testify that in early 1992, at the Director's request, the Division conducted a "very very brief, abbreviated effort" to determine whether section 500 lenders in Missouri were making a fair and reasonable profit. He acknowledged that no certified financial statements were requested or examined and no audits of financial records were performed, and described the process as a casual inquiry where the Division "had some examiners drop by" and "raise some informal questions" as to whether the section 500 loan shops in their territories seemed to be profitable enterprises. However, the Director acknowledged that the Division does not ask lenders to supply any kind of data on profitability when they submit their rates for approval and that the Division had not formally investigated what the operating costs or prof-

it margin might be for any particular lender or even the industry in general. Furthermore, there was evidence that no one from the Division ever asked to examine appellants' books or made any other "inquiry or investigation" about their profit margin under the $10/5% rate.

Finally, there was also testimony from several witnesses, including William Caton, the Consumer Credit Commissioner for the State of Kansas, that relatively high interest rates on unsecured loans under $500 are necessary in light of the high risk of default,[14] the lack of any collateral in case of default, the expenses incurred in making and administering such loans, and the cost of money to the lender.

■■■■ It is apparent from this review that the Director's determination that appellants' rates did not meet his test for "appropriateness" was unreasonable, arbitrary and capricious because it was not based on substantial evidence and because he completely failed to consider the issue of the appellants' actual profit margin or even the profit margin of the section 500 loan industry in general. The trial court's implicit finding to the contrary is unsupported by substantial evidence and against the weight of the evidence and is therefore reversed. If the Director is going to reject rate schedules on the stated or unstated ground that the rates therein are "inappropriate," a more searching inquiry based on some kind of objective data rather than mere surmise, guesswork, or a "gut feeling" will be necessary to meet basic standards of due process and to avoid being arbitrary, unreasonable, and/or capricious. Section 408.500.1, as we have held, gives the Director some discretion to determine whether a requested rate is "appropriate." However, it does not extend an open invitation to

---

12. In fact, one of these, the Ric Ser Loan Company, went out of business before trial.

13. According to Doehring, these profits represented 4% of appellants' investment *for the entire year*. It would therefore appear that appellants' profit margin is far below the "reasonable profit" figure tentatively suggested by Geary.

14. The default rate, which is a crucial factor in determining profitability, was estimated by various witnesses to be anywhere between 25 and 30%. One loan shop operator said it was his experience that when a borrower defaults on such loans, they are "essentially uncollectible."

act in a totally subjective manner without any guidelines or criteria, or without substantial evidence to support such a determination. *See U–Haul Co. v. City of St. Louis,* 855 S.W.2d 424, 427 & n. 2 (Mo.App.1993) (reversing a local administrative agency's decision on the grounds it appeared to have been made on "a purely subjective basis" and was unsupported by substantial evidence). Moreover, the "appropriateness" of the rate request is only one of the two factors the Director must consider, the other being the "rates allowed on similar loans in states contiguous to Missouri." § 408.500.1. If the submitted rates are comparable to those allowed on similar loans in a state contiguous to Missouri and are not otherwise "inappropriate," the Director must approve them. While the 180 to 200% APRs charged in Illinois may be unaffordable and excessively profitable, and therefore inappropriate, rates such as those charged in Oklahoma appear, based on the record before the trial court, to be appropriate since they are both affordable and reasonably profitable.

## IV.

The rates submitted by appellants were clearly comparable to those lawfully charged in Oklahoma, a state which is contiguous to Missouri and therefore within the "marketplace" envisioned by § 408.500.1. The Director's determination that these rates were nevertheless "inappropriate" was not based on substantial evidence and was, in fact, the product of a process in which he completely failed to consider important aspects or factors of the issues before him. As a result, the Director acted arbitrarily, capriciously, and unreasonably in refusing to approve appellants' proposed rate schedules.[15] The judgment of the trial court is therefore reversed and the case is remanded with instructions that the trial court remand the matter back to the Director with directions that he reconsider the proposed rate sched-

ules filed by appellants in April, 1991 in accordance with this opinion.

All concur.

---

**15.** In light of our resolution of appellants' other three points, there is no need to consider their fourth point, in which they allege the trial court erred in holding the Director has not established a *de facto* maximum rate of $10/5% in violation of Judge Peek's order; or their fifth point, in which they claim the trial court erred in holding that the Director did not act arbitrarily or capriciously by treating them differently from other section 500 lenders for no apparent reason.