

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| PATRICIA FAENGER, ADMINISTRATOR, and MISSOURI VETERANS HOME AT ST. JAMES, MISSOURI, | ) ) ) ) | |
| Appellants, | ) ) | WD77029 |
| v. | ) ) ) | OPINION FILED: September 16, 2014 |
| THREASA BACH, | ) ) | |
| Respondent. | ) | |

### Appeal from the Circuit Court of Cole County, Missouri
### The Honorable Daniel R. Green, Judge

**Before Division One:** Mark D. Pfeiffer, Presiding Judge, and
Lisa White Hardwick and Karen King Mitchell, Judges

The Missouri Veterans Home and Patricia Faenger (administrator for the Missouri Veterans Home—St. James) (collectively "MVH") appeal the circuit court's affirmance of the Administrative Hearing Commission's (AHC) order that Threasa Bach (a State of Missouri merit-system employee) be reinstated to her position as Nursing Assistant I. MVH argues that the AHC's order constituted an abuse of discretion and a misapplication of the law insofar as the order determined—contrary to Faenger's judgment—that Bach's dismissal was not for the good of the service. We affirm.

**Factual Background**

MVH is a state-run nursing home facility for veterans, which is operated under the authority of the Missouri Veterans Commission; the home at issue in this appeal is located in St. James, Missouri. The facility is required to have a minimum number of employees at any given time in order to provide adequate supervision and care for the residents. If a scheduled employee is unable or fails to show up for a scheduled shift, and as a result, there are an insufficient number of employees, the facility (in the absence of volunteers) has to "mandate" a non-scheduled employee to work past his or her scheduled shift to cover the deficiency created by the absent employee.[1] Recognizing that the mandating process creates a hardship on employees, the facility would make every effort to avoid the process if possible by contacting volunteers first from a volunteer list.

Because adequate staffing was a serious concern for the facility, MVH had in place Policy B-113, which provided, in part:

> All employees are expected to demonstrate regular attendance and use their leave responsibly. Employees who demonstrate patterns of tardiness in reporting for duty, patterns of absences, or absences from duty without authorization may be subject to disciplinary action, up to and including dismissal as outlined below.

The policy further indicated that "[i]t is the employee's responsibility to notify and discuss with their supervisor at the earliest possible moment any problems with their availability for work." The policy required employees to give notice of unavailability at least two hours before their scheduled shifts and provided that the failure to do so "may result in disciplinary action, up to and including dismissal." As to unauthorized absences, the policy stated that "Unauthorized absence may result in disciplinary action, up to and including dismissal." When employees

---

[1] The mandating process can affect the facility's budget because it often results in overtime compensation for the mandated employees. With adequate staffing, the facility can minimize the overtime compensation by excusing previously mandated employees from their subsequently scheduled shifts. This is not a possibility if a scheduled employee simply fails to show up to work, resulting in an insufficient number of employees.

requested time off, however, they were generally granted their requests unless there was insufficient staff for the day requested.

Bach began her employment as a certified nursing assistant with MVH at the St. James facility in April 2004. At the time, Janet Anderson was the director of nursing.[2] After a year, Bach and her husband moved to Virginia for his job, where they remained for two years before returning to Missouri. Upon her return, Bach contacted MVH to see if she could resume her former job. Anderson rehired Bach as a certified nursing assistant in 2007.

On April 1, 2008, Bach received a memo from Anderson, advising Bach that Bach failed to report to work as scheduled on March 26, 2008, without notifying her supervisor. The memo further indicated that "Failure to notify the supervisor that you will be absent from work jeopardizes the facility's ability to assure adequate staffing and places resident care at risk." According to the memo, Bach had indicated that, because of a change in her schedule, she mistakenly believed March 26, 2008, to be her day off. The memo further stated: "Based on your work history with this organization, we are excusing your failure to report to work without notifying the supervisor. In the future, please keep in mind that this may be grounds for dismissal. You are to notify the supervisor two hours prior to the start of your assigned shift when you are unable to report to work." Bach acknowledged receiving and signing this memo, but insisted that her absence had been a result of the facility's mistake and not her own.

Bach's 2008 performance evaluation, conducted by Anderson, indicated that Bach's performance needed improvement. Her 2009 performance evaluation, conducted by Chanda Saultz (Anderson's replacement), indicated that Bach's performance was successful.[3]

---

[2] Upon Anderson's retirement, Chanda Saultz took over the position.
[3] The four possible outcomes of a performance evaluation are: needs improvement (overall score less than or equal to 3.9 out of 10), successful (overall score of 4.0 to 6.9), outstanding (overall score of 7.0-8.9), or exceptional (overall score of 9.0 to 10.0).

On September 3, 2010, after missing the deadline for requesting vacation leave, Bach submitted a late request for leave on the days of September 16, 17, 20, and 21, 2010, which were a Thursday, Friday, Monday, and Tuesday.[4] Because of existing staffing numbers, her request was approved for only Friday, the 17th and disapproved for the remaining dates. On September 12, Bach resubmitted her request for leave on Monday, September 20, 2010. Her request was again denied due to insufficient staffing. Bach testified that she believed, after examining the leave slip and an out-of-date calendar, that she was off work on Thursday the 16th, but required to work on Friday, the 17th. Thus, Bach did not go to work on September 16 and did not call in. She did, however, attempt to work on September 17, but was told to go home because she was not on the schedule that day. Bach acknowledged that it was her responsibility to read the leave form and verify which dates were approved and that she had made a mistake in doing so.

On September 21, 2010, Bach received a letter notifying her that she was being dismissed, effective September 30, 2010, "because of an unscheduled and unauthorized absence from duty." The letter indicated that "On September 16, 2010, you failed to arrive for your scheduled shift and you failed to contact your supervisor of your absence."

Bach appealed her dismissal to the AHC, arguing, among other things, that her dismissal was not for the good of the service. The AHC held a consolidated hearing for Bach and two other former MVH employees that were also recently dismissed by Faenger: Velinda Kay Wofford and Bobby Petty.[5]

---

[4] The leave request, itself, addressed only numerical dates and not days of the week. Contrary to Bach's testimony that she was off on Wednesday only, the leave slip she submitted indicated that her regular days off were Wednesdays *and* Fridays; it is unclear why she requested leave for a Friday that would have been her normal day off. Additionally, Bach testified that when she showed up to work on Friday, her name had never been put on the schedule.

[5] All three women claimed that their dismissals were not for the good of the service.

4

At the hearing, MVH presented testimony indicating that, when employees failed to show up for their scheduled shifts or contact a supervisor to let the facility know that they would be unable to work, the customary response was dismissal of the "no call no show" employee; this was true of all seven MVH facilities across the state. MVH's evidence demonstrated that, within an almost-two-year period (January 2009 through October 31, 2010), there were 153 dismissals statewide for no-call, no-show employees at MVH facilities; 24 of these dismissals were from the St. James facility. However, MVH did not present evidence indicating how these numbers relate to the overall number of no-call, no-show events. Faenger, the facility's administrator, indicated that the facility has essentially a zero-tolerance policy for no-call, no-show employees. And absent extenuating circumstances—which she described as situations like a car accident, when an employee was actually incapable of getting to work or calling in—the result would be dismissal of the employee.

Bach presented evidence from herself, Petty, Wofford, and Kathy Hays (a former employee of MVH who worked as a certified nursing assistant from September 2004 until June of 2011) on the issue of whether dismissal was for the good of the service.[6]

All four women testified that, contrary to the claimed zero-tolerance policy, there were employees that had been no-call no-shows but had not been dismissed; instead, the employees were called and told to come in.[7] Those individuals were identified as John Morgan, Patty Roland, Sara Stewart, Donna Pasalaqua, and Joni Sellinger. According to the testimony, there were at least two instances involving Morgan: in the first instance, he was at home sleeping and

---

[6] Bach also presented testimony from Ellen Greer House (who had been employed at the facility as an evening charge nurse for approximately two and a half months, from May 1, 2009, through July 13, 2009) indicating that Bach "did an excellent job" and "went far and beyond what most aides did to take care of those residents."

[7] Bach testified that the facility's policy was *not* to call individuals that failed to call or report for their scheduled shifts and that this "no call" policy was the subject of a labor management meeting.

had to be called and told to come in; and in the second, he claimed to have insufficient gasoline in his car, but another employee was directed (by Saultz) to pick him up and bring him in.

As for Stewart, Pasalaqua, and Sellinger, according to Bach, Stewart failed to show up for a shift because her car would not start; but rather than being dismissed, Stewart was picked up by another employee and brought into work. Bach testified that Pasalaqua had made a scheduling mistake, believing that she had been approved for leave when she had not; rather than dismissing Pasalaqua, the facility called and advised her of the error. As for Sellinger, Bach did not explain the reason for Sellinger's failure to call or show up, but Sellinger was apparently called by someone at the facility and told to come in.[8]

In addition to the five individuals mentioned above, Petty testified that, approximately eighteen months before her dismissal, she had failed to call or show up for a scheduled shift on March 9, 2009, due to her own scheduling mistake and incorrect belief that she was on leave, but the facility had excused her absence at that time, just like Bach's prior no-call, no-show, "based on [her] work history with [the] organization."[9]

Wofford testified that she was dismissed for being a no-call, no-show. Like Bach, Wofford had sought leave time, but was granted only part of the time she requested. Due to an oversight, Wofford failed to show up for the part of her scheduled shift that was not approved for leave. As with Bach, the facility dismissed Wofford.

The AHC reinstated Bach to the position of Nursing Assistant I. The AHC specifically found that MVH had cause for dismissing Bach based upon her failure to call or show for her

---

[8] There was no evidence regarding the reason for Roland's failure to call in or show up for her scheduled shift. The evidence was, however, that she was called and told to come in, rather than being dismissed.

[9] Petty was ultimately dismissed for a subsequent alleged no-call, no-show. On that occasion, Petty had called in to advise the facility that her car would not start. Petty was seen later in the day at a restaurant nearby the facility during what would have been her regular shift. Because Petty had not called the facility back to advise them whether she would be able to work any part of her shift, the facility deemed her a no-call, no-show and dismissed her.

6

scheduled shift on September 16, 2010. But the AHC determined that Bach's dismissal was not for the good of the service. Specifically, the AHC found that "Faenger failed to meet her burden of proof" on this issue.

MVH petitioned the circuit court of Cole County for judicial review of the AHC's decision. After receiving briefs from both parties, the circuit court denied MVH's request and sustained the AHC's decision, reinstating Bach. MVH appeals.

**Standard of Review**

"On an appeal from the trial court's review of an AHC decision, we review the decision of the AHC, not the judgment of the trial court." *Dep't of Soc. Servs. v. Peace of Mind Adult Day Care Ctr.*, 377 S.W.3d 631, 637 (Mo. App. W.D. 2012). "'The AHC's decision will be upheld unless it is not supported by competent and substantial evidence upon the whole record; it is arbitrary, capricious, or unreasonable; it is an abuse of discretion; or it is otherwise unauthorized by law or in violation of constitutional provisions.'" *Id.* (quoting *Beverly Enters.-Mo. Inc. v. Dep't of Soc. Servs.*, 349 S.W.3d 337, 351 (Mo. App. W.D. 2009)).

In determining whether a decision is supported by competent and substantial evidence, we review the record as a whole and determine whether the AHC's decision is against the overwhelming weight of the evidence. *Id.* (citing *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003)). Though we do not view the AHC's factual findings in the light most favorable to the decision, "we still must defer to its credibility findings, as the AHC is the sole judge of the credibility of witnesses and the weight and value to give to the evidence." *Id.* (internal quotation omitted). "We review the AHC's conclusions on the interpretation and application of the law[, however,] *de novo*." *Id.*

7

**Analysis**

MVH raises a single point on appeal. MVH claims that the AHC abused its discretion and misapplied the law when it reinstated Bach on the ground that her dismissal was not for the good of the service. We disagree.

"An appointing authority may dismiss for cause any employee in [her] division occupying a position subject hereto when [s]he considers that such action is required in the interests of efficient administration and that the good of the service will be served thereby." § 36.380.[10] "Section 36.380 thus provides that, in order to terminate a merit employee, an appointing authority must first have cause to do so." *Bowen v. Mo. Dep't of Conservation*, 46 S.W.3d 1, 10 (Mo. App. W.D. 2001). "'For cause' means legal cause." *Mo. Veterans Home v. Brown*, 374 S.W.3d 359, 365 (Mo. App. W.D. 2012). "It 'must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public.'" *Id.* (quoting *Prenger v. Moody*, 845 S.W.2d 68, 77 (Mo. App. W.D. 1992)).

"The statute then provides a second tier of inquiry for the appointing authority, stating that before deciding to dismiss the merit employee for cause, the appointing authorities must consider whether dismissal is in the interests of efficient administration and whether 'the good of the service will be served thereby.'" *Bowen*, 46 S.W.3d at 10 (quoting § 36.380). "[T]he terms 'cause' and 'for the good of the service' are not synonymous," 1 C.S.R. § 20-3.070(5)(C)(2), though "it is not surprising that it would often be for the good of the service to terminate an employee who had given cause to do so." *Bowen*, 46 S.W.3d at 10. "It is true that, in the case of merit employees, courts have often combined their inquiry into whether a firing was for cause

---

[10] All statutory references are to the Revised Statutes of Missouri 2000, as updated through the 2010 Cumulative Supplement, unless otherwise noted.

8

with whether it was for the good of the service"; nevertheless, there is "an analytical distinction between the terms 'for cause,' and 'for the good of the service.'" *Id*. at 10, 11. And "[t]o the extent that . . . cases [have] indicated in *dicta* that these terms are always used synonymously, they would not be correct with respect to Section 36.380, which states that first a merit employee must give cause for his termination; only then is inquiry made as to whether termination would be for the good of the service." *Id*. at 11 n.2.

"Although not defined by the statutes, the standard 'for the good of the service' . . . [11] requires a decision by the appointing authority that the employee's conduct is of such a serious nature that dismissal is required rather than some other form of discipline." *Lombardi v. Dunlap*, 103 S.W.3d 786, 791 (Mo. App. W.D. 2003). "Ultimately, the question of whether termination was for the good of the service is a matter for the agency's determination." *Snider v. Mo. Highways and Transp. Comm'n*, 356 S.W.3d 320, 324 (Mo. App. W.D. 2011). And "'it is not our role to substitute our judgment for that of the [agency] as to what is for the good of the service.'" *Id*. (quoting *Bowen*, 46 S.W.3d at 11); *see also Mo. Dep't of Corr. v. Cheeney*, 926 S.W.2d 939, 941 (Mo. App. W.D. 1996) ("The authority of the [AHC] to approve or disapprove a dismissal, however, does not extend discretion to the [AHC] to override the judgment of the appointing authority that dismissal of an employee is for the good of the service.").

This is not to say, however, that once an appointing authority determines that dismissal is for the good of the service, that determination is thereafter unassailable. *See Mo. Veterans' Comm'n v. Vanderhook*, 290 S.W.3d 115, 120 (Mo. App. W.D. 2009) (rejecting the contention that "the appointing authority's determination that dismissal is for the good of the service is

---

[11] *Lombardi* further indicates that the standard "implies some personal misconduct or fact that renders the employee's further employment harmful to the public interest." *Lombardi v. Dunlap*, 103 S.W.3d 786, 791 (Mo. App. W.D. 2003). We omitted this language because it is the same language identified by this court in *Bowen* as improperly conflating the concepts of "cause" and "good of the service." *Bowen*, 46 S.W.3d at 10 n.2. Thus, it is not the appropriate standard by which to determine whether dismissal was for the good of the service.

unassailable" as "clearly incorrect"). Section 36.390.5 provides that "[a]ny regular employee who is dismissed . . . for cause . . . may appeal in writing to the [AHC] . . . , setting forth in substance the employee's reasons for claiming that the dismissal . . . was for political, religious, or racial reasons, or not for the good of the service."

> "It would be pointless for the statute to provide that the employee may explain why he or she believes dismissal was based on these grounds unless the legislature intended that the reviewing body then determine whether termination was for political, religious, or racial reasons, or not for the good of the service, and, if it finds that this was the basis of termination, to reverse the decision. Otherwise, the right to claim that dismissal was for improper reasons would be a hollow and pointless right indeed."

*Vanderhook*, 290 S.W.3d at 120 (quoting *Bowen*, 46 S.W.3d at 9); *see also Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 892 (Mo. App. W.D. 1995) ("The fact that the legislature has vested discretion in an administrative official does not preclude a reviewing [body] from determining whether . . . he . . . acted in an unlawful, unconstitutional, arbitrary, capricious, unreasonable or abusive manner.").

In examining whether an employee's dismissal was "in the interests of efficient administration" and "for the good of the service," the appointing authority must first consider whether the employee's conduct affected either her ability to perform her job or the agency's ability to carry out its obligations. *See Snider*, 356 S.W.3d at 325 (dismissal was for the good of the service where evidence suggested that employee's behavior affected "his ability to work as a team with other employees" and was "disruptive to the workplace," as well as the facts that employee was "not essential" and his absence had no effect on the facility's overall functioning); *Bowen*, 46 S.W.3d at 11 (identifying various reasons why dismissal might not be for the good of the service, such as the essential nature of the employee to the Department's function, the effects of the employee's departure on morale, or the employee's history or motivation). In making this determination, the appointing authority may consider the employee's violation of a general rule

of conduct. *Lombardi*, 103 S.W.3d at 791-92 (dismissal of corrections officer was for the good of the service where evidence indicated that officer's violation of a policy prohibiting personal contact with inmates could "lead to the offender population's loss of respect for staff, jealousy between offenders, and extortion of staff by offenders" and "directly threaten[ed] the overall safety and security of the institution"); *Black v. Lombardi*, 970 S.W.2d 378, 381 (Mo. App. E.D. 1998) (suspension of corrections officer, charged with assault, was for the good of the service, even though charges had been dismissed and were not connected with his job, because the charges, even though dismissed, "could affect his ability to gain and hold the confidence of staff and inmates").

The appointing authority must then consider whether the conduct's effect on either the employee's ability to perform her job or the facility's ability to carry out its obligations was sufficiently serious so as to warrant dismissal, rather than a lesser form of discipline. *Prenger*, 845 S.W.2d at 74. And because it is the employing agency's burden to "establish grounds for dismissal," *Vanderhook*, 290 S.W.3d at 119, the appointing authority must present evidence before the AHC to support its consideration of each of these elements.

Here, though MVH presented evidence of the heightened need for consistent employee attendance, it failed to meet its burden of demonstrating that dismissal, rather than some lesser punishment, was required to combat employee attendance issues.[12]

Faenger's sole evidence demonstrating why dismissal, rather than some lesser punishment, was necessary was the facility's alleged zero-tolerance policy for no-call, no-show

---

[12] While, obviously, employee absence affects that particular employee's ability to perform her job, it does not appear that it necessarily affects the facility's ability to carry out its functions. Although the facility must maintain a minimum number of individuals on staff at any given time, an employee's absence did not preclude the facility from doing so. The evidence indicated that the facility was able to maintain the minimum number by either contacting volunteers from a volunteer list to cover shifts, or by mandating employees that were already present to stay beyond their scheduled shifts and cover the absence. And while it would be easier for the facility to carry out its function without having to worry about employee absence, it is not necessarily true that the facility's ability to do so is hampered by employee absence.

11

employees. Faenger testified that dismissal was the standard response in no-call, no-show situations, absent extenuating circumstances. The example both she and Saultz provided of an extenuating circumstance was an unexpected event, like a car accident, that would actually prevent the employee from being able to call in or show up to work. Faenger indicated that, because attendance was such a serious concern, when an employee failed to call in or show up for work, the employee would be dismissed, without any consideration of the employee's performance or work history. Faenger indicated that this essentially zero-tolerance policy, resulting in dismissal, was necessary for efficient administration and the good of the service. The evidence, however, suggested that, while reliable attendance was important to the operation of the facility, MVH did not actually believe that a zero-tolerance policy was necessary to ensure adequate attendance, given the fact that exceptions were made to the policy based on the very reasons Faenger declared to be irrelevant to the determination.

There were eleven total instances of employee no-call, no-shows testified to at the hearing. Of these eleven, only the three at issue (Bach, Petty, and Wofford) resulted in dismissal.[13] Five of the no-call, no-show incidents involved scheduling mistakes, but only two of those scheduling mistakes resulted in dismissal (Bach and Wofford). Three of the incidents involved employee car trouble, but only one of the car-trouble instances resulted in dismissal (Petty). Additionally, contrary to Faenger's assertion that employee performance and work history were irrelevant to the question of whether the employee would be dismissed, there were

---

[13] In noting these discrepancies, we do not mean to imply that selective enforcement is a viable consideration in this context, as the appointing authority is vested with a considerable amount of discretion in this context. *See Roorda v. City of Arnold*, 142 S.W.3d 786, 798-99 (Mo. App. W.D. 2004) ("While we decline to decide whether [selective enforcement] is viable in a civil action where the decision of an administrative body upholding the termination of a public employee is challenged, we note that to accept [this] argument would be to hold that regardless of the circumstances, unless the [appointing authority] disciplines all [employees] who violate [agency policy], he may not discipline any."); *see also Jarrett v. Hill*, 648 S.W.2d 170, 173 (Mo. App. E.D. 1983) (rejecting dismissed employee's argument that the appointing authority's disparate treatment of similar violations rendered that decision arbitrary and capricious). We are noting these discrepancies merely as support for the AHC's determination that MVH's evidence regarding the need for a zero-tolerance policy was not credible.

at least two no-call, no-show incidents—not involving extenuating circumstances as defined by Faenger and Saultz—wherein the unauthorized absences were excused "[b]ased on [the employee's] work history with this organization."

Given this conflicting evidence, it appears that the AHC found Faenger's testimony, that a zero-tolerance policy resulting in dismissal was required for the good of the service and efficient administration, not to be credible. We defer to the AHC's credibility determinations because "the AHC 'is the sole judge of the credibility of witnesses and the weight and value to give to the evidence.'" *Peace of Mind*, 377 S.W.3d at 637 (quoting *Mo. Real Estate Appraisers Comm'n v. Funk*, 306 S.W.3d 101, 105 (Mo. App. W.D. 2010)).

It was MVH's burden to establish that its zero-tolerance policy regarding attendance was for the good of the service and in the interests of efficient administration. The AHC determined, however, that MVH's evidence regarding the necessity for a zero-tolerance policy was not credible. This left MVH without substantial evidence supporting Faenger's discretionary determination that Bach's dismissal was for the good of the service. Thus, we cannot say that the AHC erred in determining that MVH failed to meet its burden.

Point denied.

### Conclusion

Because the AHC's decision was supported by competent and substantial evidence, the trial court's decision affirming the AHC's order is affirmed.

_____
Karen King Mitchell, Judge

Mark D. Pfeiffer, Presiding Judge, and
Lisa White Hardwick, Judge, concur.