DEPARTMENT OF SOCIAL SER-
VICES, MO HealthNet Division, and
Department of Health and Senior Ser-
vices, Appellants,

v.

PEACE OF MIND ADULT DAY CARE
CENTER, Respondent.

No. WD 74519.

Missouri Court of Appeals,
Western District.

Sept. 25, 2012.

Matthew J. Laudano, Jefferson City, MO, for appellants.

Harvey M. Tettlebaum and Barbara L. Miltenberger, Jefferson City, MO, for respondent.

Before Division Three: VICTOR C. HOWARD, Presiding Judge, KAREN KING MITCHELL, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

The Missouri Department of Social Services ("DSS") and the Missouri Department of Health and Senior Services ("DHSS") (collectively, "the Departments") appeal from the Missouri Administrative Hearing Commission's ("AHC") decision holding that Peace of Mind Adult Day Care Center ("Peace of Mind") is not subject to MO HealthNet sanctions, that Peace of Mind is entitled to a participation agreement with DHSS for home- and community-based care, and that Stephanie Patton ("Patton") is entitled to a payment of $45,340 for adult day care services rendered from December 20, 2008, through February 20, 2009. The Departments contend that the AHC erred in five respects: (1) in finding that Patton properly raised and preserved allegations of constitutional violations against DHSS and in considering the merits of those constitutional violations; (2) in ruling against the Departments because its decision was not supported by substantial and competent evidence on the record; (3) in finding that there were two bases for DSS to sanction Patton and in rejecting three other bases for sanctions; (4) in refusing to impose DSS sanctions on Patton; and (5) in finding Patton is entitled to a DHSS participation agreement for home- and community-based services. We affirm in part

and reverse in part.[1]

## Factual and Procedural History

Patton was the owner and operator of Peace of Mind, an adult day care facility in St. Louis devoted to serving African Americans. DHSS offers two types of licenses to adult day cares, depending on the services the facility provides. If an adult day care facility offers medical services and complies with 19 CSR 30–90.050(8)(D), then DHSS issues a medical model license to the adult day care. If no medical services are provided or the adult day care facility does not comply with 19 CSR 30–90.050(8)(D), then the adult day care will be licensed as a social model facility. Peace of Mind had a medical model license that was set to expire on December 20, 2008.

### December 21, 2008 Issuance of a Provisional Social Model License by DHSS

Prior to the expiration of the license, two DHSS inspectors from the St. Louis regional office—Cassie Blum ("Blum") and Sharon Davis Buckner ("Buckner")—conducted an unannounced inspection of Peace of Mind on October 16, 2008. Patton was not at the facility at the time the inspection began. Once Patton arrived, she introduced herself to the inspectors and accompanied them throughout the building. The inspection was not completed, but the evidence presented at the hearing was not conclusive as to why Blum and Buckner did not complete the inspection. The programming manager for licensing and certification testified that the inspection was not completed because "[t]he relationship between the program director and [the inspectors] became very aggravated."

Patton testified that Blum and Buckner were rude and disruptive during the inspection and upset Peace of Mind's clients. According to Patton's testimony, Blum called Patton a racial epithet and accused Patton of being illiterate. The inspectors called the local police department, and officers responded to Peace of Mind. The police report indicated that Michael Carr ("Carr")—one of Peace of Mind's employees—told the police that "Blum appeared to have an agenda when she walked in to conduct her inspection." Blum and Buckner, on the other hand, told the police that Patton said, "I'm gonna hurt her."

Patton called DHSS's St. Louis regional office to speak to the inspectors' supervisor, Mary Collier ("Collier"). Patton asked to speak with "Mary" and her call was transferred to Mary Cannon ("Cannon"). Patton told Cannon that Blum was "making [a] big scene" and being disrespectful. A few days later, Patton realized that she had spoken with the wrong "Mary" and wrote a letter to Collier that described the inspectors' behavior on October 16, 2008. DHSS subsequently sent Patton a letter, reminding Patton of her obligation to cooperate fully with DHSS inspectors, as set forth in section 660.407.[2]

In response to the failed inspection, DHSS decided to send officials from Jefferson City to complete the inspection of Peace of Mind. DHSS selected Tracy Niekamp ("Niekamp"), the program manager for licensing and certification, and Shelly Williamson ("Williamson"), the operations manager for the section for long-term care regulation, to conduct an unannounced inspection of Peace of Mind on

1. We review the decision of the AHC rather than the decision of the trial court, but under Rule 84.14, our disposition on appeal must reverse, affirm, or otherwise act upon the judgment of the trial court. *Mo. Real Estate*

*Appraisers Comm'n v. Funk*, 306 S.W.3d 101, 103 n. 1 (Mo.App. W.D.2010).

2. All statutory references are to RSMo 2000 as supplemented unless otherwise noted.

December 5, 2008. During that inspection, Niekamp and Williamson claim to have observed that, despite having a medical model license, Peace of Mind did not have a nurse on duty. Niekamp and Williamson testified that in response to their question about Peace of Mind's medical model license, Patton told them that she was not sure why she had a medical model license because she had not employed a nurse since late 1999 or early 2000. On cross-examination, Niekamp admitted that she did not ask Peace of Mind's employees whether a nurse was present. Patton's testimony was in sharp contrast to Niekamp and Williamson's testimony. Patton testified that there were two nurses on duty during the inspection.

As a result of Niekamp and Williamson's reported finding that Peace of Mind's failed to employ a nurse, Tracy Cleeton ("Cleeton")—DHSS's adult day care program manager—wrote Patton a letter that informed her Peace of Mind "was not in substantial compliance" with the requirements for adult day care licensure.[3] The letter indicated that DHSS was issuing Peace of Mind a provisional social model license to be effective December 21, 2008, a day after the medical model license expired. The letter did not inform Patton of her right to appeal DHSS's decision to the AHC.

### December 20, 2008 Termination of Participation in MO HealthNet by DSS

DHSS also sent DSS a copy of Cleeton's letter to Patton because Peace of Mind was enrolled as a Title XIX MO HealthNet adult day care provider and received reimbursement by MO HealthNet for adult day care services provided. DSS regulations require a participant in the MO HealthNet program to maintain a medical model license from DHSS. *See* 13 CSR 70–92.010(3)(A), (3)(F). As a result of Peace of Mind's failure to maintain a medical model license, DSS terminated Peace of Mind's participation in the MO HealthNet program effective on the close of business of December 20, 2008, and stopped making payments to Peace of Mind. DSS informed Patton of its decision in a letter dated February 2, 2009.

### February 11, 2009 Reissuance of a Medical Model License by DHSS

Patton contacted DSS to ask why Peace of Mind's participation in the MO HealthNet program was terminated. The DSS employee told Patton that Peace of Mind's participation was terminated because it no longer had a medical model license and that Patton could call DHSS to speak about licensing. Patton contacted DHSS and asked about having Peace of Mind's medical model license reinstated. DHSS informed Patton that she would have to hire a licensed nurse to be at Peace of Mind during its business hours. Patton provided proof that Peace of Mind employed a licensed nurse, and on February 11, 2009, DHSS issued Peace of Mind a medical model license following an inspection that revealed Peace of Mind "was in substantial compliance with the licensure law, rules and regulations." DHSS informed DSS of the reissuance of Peace of Mind's medical model license.

### Denial of MO HealthNet Claims by DSS

Between December 20, 2008, and February 20, 2009, Peace of Mind submitted MO HealthNet claims in the amount of $45,340 for services rendered. DSS denied the

---

**3.** DHSS did not issue Patton a statement of deficiencies with the letter, though. Patton spoke with Representative Talibdin El–Amin ("Rep. El–Amin") on January 14, 2009, because she did not receive a statement of deficiencies. Once Rep. El–Amin requested the statement of deficiencies, Niekamp faxed a copy to Rep. El–Amin's office the same day. The statement of deficiencies indicated that Peace of Mind had no licensed nurse on staff.

claims. Peace of Mind did not have enough cash to operate, and clients left for other adult day cares because Peace of Mind no longer had MO HealthNet funding. In February 2009, Patton's landlord locked her out of the building.

### DSS Records Audit

Shortly after the reissuance of Peace of Mind's medical model license, DSS decided to audit Peace of Mind. A DSS internal memorandum indicated that Peace of Mind was selected for an audit because DHSS had informed DSS that Peace of Mind did not have a licensed nurse on staff. On February 17, 2009, DSS informed Patton of the audit it planned to conduct the next day. All MO HealthNet providers are required to retain "all records relating to services provided to MO HealthNet participants or records relating to MO HealthNet payments" for five years and make those records available to DSS. 13 CSR 70–3.030(3)(A)(4). Former providers are also required to keep the records and make them available to DSS upon request. *Id.*

DSS auditors arrived at Peace of Mind the next day, February 18, 2009. The purpose of the audit was "[t]o determine Title XIX service policy compliance." The audit sought documentation supporting the services Peace of Mind billed to the MO HealthNet program from July 1, 2006, to December 20, 2008. Patton refused to provide documentation to the auditors. The auditors asked Patton if she would produce the records the following day. DSS auditors returned to Peace of Mind on February 19, 2009, but Patton was not at Peace of Mind that morning and did not provide records to DSS.

### Backdated Restoration as Participant in MO HealthNet by DSS

Peace of Mind sought to re-enroll as a MO HealthNet provider in March 2009. Patton completed an open-ended Title XIX provider agreement and sent it to DSS on or about March 5, 2009. DSS refused to accept the open-ended Title XIX provider agreement. Peace of Mind had yet to produce the records requested by DSS. Despite this failure, DSS notified Patton in a letter dated March 24, 2009, that it agreed to issue Peace of Mind a closed-end agreement.[4]

Judith Muck ("Muck"), deputy division director over operations for DSS, met with Patton on or about April 2, 2009, in the office of Representative Cole McNary ("Representative McNary"). Patton signed the closed-end Title XIX participation agreement for adult day health care services that day. According to Muck's testimony, the agreement was backdated to February 2, 2009, and set to expire on February 10, 2010. Patton believed that DSS would reimburse Peace of Mind for the services provided from February 11, 2009, the date her medical model license was reinstated by DHSS. Relying on that belief, Patton borrowed money from a friend to pay the landlord and regain access to Peace of Mind's facility.

Peace of Mind was not able to bill MO HealthNet for the services provided on and after February 11, 2009, though. Muck testified that Peace of Mind did not receive reimbursement for services because DHSS had not yet given Peace of Mind prior authorization for those claims. According to Muck, prior authorization would have been given had Peace of Mind

---

4. The Departments did not explain the difference between an open-ended agreement and a closed-end agreement, but copies of each agreement were entered into evidence. Based on our reading of those agreements, the difference between the two is their anticipated length. An open-ended agreement has no end date, making it indefinite, whereas a closed-end agreement has a definite date of expiration.

produced the records requested for the audit. DSS did not communicate in writing to Patton that her rights under the closed-end participation agreement were conditioned on producing the records.

Muck called Patton on April 15, 2009, to arrange a time for DSS staff to retrieve copies of Peace of Mind's records related to services provided to MO HealthNet participants. Patton told Muck that she would not produce the records. Patton testified that some of the records were lost in the 2008 flood of University City and other records were lost when she could not pay Peace of Mind's rent, as the landlord put her possessions onto the street.

*Imposition of Sanctions for Failed Records Audit by DSS*

On April 21, 2009, DSS sent Patton two letters imposing sanctions for Patton's failure to produce records. One informed Patton that Peace of Mind's participation in the MO HealthNet program was terminated, effective immediately upon receipt of the letter. The other letter indicated that DSS deemed Peace of Mind to have been overpaid $487,462.08 in MO HealthNet funds because Peace of Mind had failed to produce documentation for the services rendered from July 1, 2006, to December 20, 2008, the time period DSS attempted to audit.

*May 16, 2009 Termination of Participation Agreement by DHSS*

DSS sent a copy of each letter to DHSS, which maintained its own participation agreement with Peace of Mind. DHSS took the position that its participation agreement required Peace of Mind, as an adult day health care program, to have a signed MO HealthNet participation agreement with DSS. Because Peace of Mind's participation agreement with DSS for the MO HealthNet program was terminated for failure to comply with the audit, DHSS took the position that Peace of Mind could

no longer fulfill its agreement with DHSS to participate in the adult day health care program. DHSS terminated Peace of Mind's participation agreement effective May 16, 2009, and sent Patton a letter dated May 29, 2009, that informed her of the termination.

*July 7, 2009 License Revocation by DHSS*

On May 28, 2009, DHSS employees went to Peace of Mind to conduct an inspection of the facility. The DHSS employees "found the center locked, lights off, and Easter decorations remain[ing] on the wall." DHSS sent a letter to Patton on June 4, 2009. The letter informed Patton that the failure to cooperate with an inspection of the facility is a ground for revoking an adult day care license. As a result, the letter asked Patton to confirm the status of Peace of Mind by June 30, 2009, and if no confirmation was given by that date, DHSS would consider Peace of Mind closed. After receiving no response from Patton, DHSS sent her a letter on July 7, 2009, that indicated Peace of Mind's adult day care license was revoked and requested that Patton return the license to DHSS. The letter revoking Peace of Mind's license informed Patton of her right to appeal DHSS's decision to the AHC.

*Administrative Proceedings*

Patton appealed six decisions of the Departments to the AHC: (1) DHSS's conversion of Peace of Mind's license from a medical model to a social model on December 21, 2008; (2) DSS's termination of Peace of Mind's participation in the MO HealthNet program on February 2, 2009; (3) DSS's subsequent termination of Peace of Mind's participation in the MO HealthNet program on April 21, 2009, after Peace of Mind failed to produce the records requested; (4) DSS's assessment of an over-

payment of $487,462.08 in MO HealthNet funds to Peace of Mind, premised on the failure to produce the records requested; (5) DHSS's termination of its participation agreement with Peace of Mind on May 16, 2009; and (6) DHSS's revocation of Peace of Mind's adult day care license on July 1, 2009. The AHC consolidated Patton's six appeals into one and held a hearing.

On October 22, 2010, the AHC issued its written decision, making four findings based on its *de novo* review of the decisions made by the Departments. First, the AHC found that Patton was a credible witness based on her demeanor during the hearing and indicated that, in making its findings of fact, it relied on Patton's credibility. Second, the AHC found that Peace of Mind should not be subjected to DSS MO HealthNet sanctions, including the termination of its MO HealthNet provider agreement and the overpayment payment sanction. Third, the AHC found that Patton was entitled to a MO HealthNet payment from DSS in the amount of $45,340 for services provided by Peace of Mind from December 20, 2008, to February 20, 2009, the time period in which Peace of Mind had a DHSS social model license but should have had a DHSS medical model license. Fourth, the AHC found that Peace of Mind was entitled to a participation agreement with DHSS for the provision of home- and community-based care.[5]

The Departments appealed the AHC's decision to the Cole County Circuit Court. The circuit court affirmed the AHC's decision.

The Departments appeal.

## Standard of Review

On an appeal from the trial court's review of an AHC decision, we review the decision of the AHC, not the judgment of the trial court. *State Bd. of Registration for the Healing Arts v. Trueblood,* 368 S.W.3d 259, 261 (Mo.App. W.D.2012). "The AHC's decision will be upheld unless it is not supported by competent and substantial evidence upon the whole record; it is arbitrary, capricious, or unreasonable; it is an abuse of discretion; or it is otherwise unauthorized by law or in violation of constitutional provisions." *Beverly Enters.-Mo. Inc. v. Dep't of Soc. Servs.,* 349 S.W.3d 337, 351 (Mo.App. W.D.2009); *see also* section 536.140.2.

We examine the AHC's decision to determine " 'whether, considering the whole record, there is sufficient competent and substantial evidence to support the award.' " *Albanna v. State Bd. of Registration for the Healing Arts,* 293 S.W.3d 423, 428 (Mo. banc 2009) (quoting *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 223 (Mo. banc 2003)). This standard would not be met when the AHC's decision is against the great weight of the evidence. *Id.* While *Hampton* abolished the "light most favorable" standard for evaluating the factual findings of the AHC, we still must defer to its credibility findings, as "the AHC 'is the sole judge of the credibility of witnesses and the weight and value to give to the evidence.' " *Funk,* 306 S.W.3d at 105 (quoting *Clayton v. Langco Tool & Plastics, Inc.,* 221 S.W.3d 490, 493 (Mo.App. S.D.2007)).

We review the AHC's conclusions on the interpretation and application of the law *de novo. Id.*

---

5. Although Patton appealed DHSS's revocation of Peace of Mind's adult day care license on July 7, 2009, the AHC's decision neither reversed nor affirmed that revocation. Neither party has raised the issue on appeal.

## Analysis

Though the AHC's conclusions were primarily agency specific, the Departments filed a joint appeal. The Departments present five points relied on. The first and fifth points relied on address findings affecting DHSS. The third and fourth points relied on address findings affecting DSS. The second point relied on addresses findings affecting both DHSS and DSS. For the sake of clarity, we address the points relied on out of order. We first address the jointly asserted point relied on. We will then address the points raised by DSS separately from the points raised by DHSS.

### The AHC Decision With Respect to DSS and DHSS (Point Two)

In their second point relied on, the Departments challenge the AHC's decision in general "because its decision is not supported by competent and substantial evidence on the record as a whole in that its findings on several key factual issues fail to account for contrary evidence on the record." Then, in the argument section following the second point, the Departments identify six, disparate factual findings made by the AHC that DSS, DHSS, or both dispute.[6] The Departments' second point relied on does not comply with Rule 84.04.

Rule 84.04(d)(2) concerns the points relied on for an appeal from an administrative agency. It requires each point relied on to:

(A) identify the administrative ruling or action that the appellant challenges;

(B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

Rule 84.04(d)(2). Our Supreme Court explained the purpose of Rule 84.04 in *Thummel v. King*, 570 S.W.2d 679, 686 (Mo. banc 1978):

The requirement that the point relied on clearly state the contention on appeal is not simply a judicial word game or a matter of hypertechnicality on the part of appellate courts.... Perhaps the most important objective of the requirement relative to the points relied on is the threshold function of giving notice to the party opponent of the precise matters which must be contended with and answered.... [S]uch notice is essential to inform the court of the issues presented for resolution.... If the appellate court is left to search the argument portion of the brief ... to determine and clarify the nature of the contentions asserted, much more is at stake than a waste of judicial time.... The more invidious problem is that the court may interpret the thrust of the contention

---

6. The six challenged factual findings are: (1) that Blum, a DHSS employee, called Patton a racial epithet during the October 16, 2008, inspection; (2) that Peace of Mind had two nurses, Shay Johnson and Lakeisha Staton, on duty during the December 5, 2008, DHSS inspection; (3) that Peace of Mind had a nurse on duty at all times; (4) that Patton did not inform DHSS inspectors on December 5, 2008, that Peace of Mind was incorrectly licensed as a medical model; (5) that Patton had no records to produce to DSS on February 18, 2009; and (6) that Patton indicated that she could not produce the records requested by DSS on April 15, 2009. Even if the Departments' second point relied on complied with Rule 84.04, it would still fail. The Departments' argument regarding these six factual findings has a singular basis: the Departments disagree with the AHC's finding that Patton was a credible witness. As previously noted, the AHC " 'is the sole judge of the credibility of witnesses.' " *Funk*, 306 S.W.3d at 105 (quoting *Clayton*, 221 S.W.3d at 493). We may not undermine that credibility finding.

differently than the opponent or differently than was intended by the party asserting the contention. If that happens, the appellate process has failed in its primary objective of resolving issues raised and relied on in an appeal.

In *Thummel,* one of the appellant's points relied on stated: "The Court Erred in Failing to Make Necessary and Proper Findings of Fact on Principal Controverted Fact Issues." *Id.* at 688. Our Supreme Court rejected the point relied on because it was an "attempt to shotgun refusal of all of the proposed findings into one point." *Id.* The appellant's point relied on would have complied with Rule 84.04 had it selected specific findings by the court and then explained the reasons why those findings were in error. *Id.*

Here, the Departments' second point relied on challenges the AHC's decision in general because it "is not supported by competent and substantial evidence" in that the decision fails "to account for contrary evidence." The point relied on does not select specific findings by the AHC. Instead, it attempts a "shotgun refusal" of the AHC's entire decision. Because we had to search the argument to find which factual findings the Departments challenged, the second point relied on did not comply with Rule 84.04 and will be denied. As a result, the factual findings improvidently contested in the argument portion of the brief's discussion of this point are accepted as true.[7]

***The AHC Decision With Respect to DSS (Points Three and Four)***

■ The AHC reached two conclusions relevant to DSS: (1) that Peace of Mind was not subject to the sanction of termination of its MO HealthNet provider agreement or of the obligation to repay $487,462.08; and (2) that Patton was entitled to reimbursement of $45,340 for the MO HealthNet services Peace of Mind rendered from December 20, 2008, to February 20, 2008. DSS challenges the first conclusion that Peace of Mind was not subject to MO HealthNet sanctions, but not the second.[8] Specifically, DSS alleges that the AHC abused its discretion in failing to impose sanctions (point four) and erred in only finding two violations that could warrant sanctions instead of five (point three). We begin our discussion with point four.

■ " 'The [AHC's] function is to render the administrative decision of the agency.' " *Dep't of Soc. Servs. v. Mellas,* 220 S.W.3d 778, 782 (Mo.App. W.D.2007) (quoting *Dep't of Soc. Servs. v. Admin. Hearing Comm'n,* 826 S.W.2d 871, 874 (Mo.App. W.D.1992)). The AHC exercises its own judgment in reaching a decision. *Id.* at 783. "This includes the exercise of ***any*** discretion that the department would exercise." *Id.* (emphasis added).

The AHC took a methodical approach in making its decision. First, it considered whether Peace of Mind committed one or more MO HealthNet program violations, as set forth in 13 CSR 70–3.030(3)(A); in other words, the AHC determined whether there was cause to sanction Peace of Mind. DSS alleged that there were four bases for Peace of Mind to be sanctioned. The AHC found that the evidence presented at the

7. *See* footnote 6.

8. The Departments put forth no argument that the AHC erred in awarding Patton a payment of $45,340 for the MO HealthNet services Peace of Mind provided from December 20, 2008, to February 20, 2008. Further, the Departments' prayer for relief specifically asks us to reverse "the decisions of the [AHC] challenged in this appeal." Because DSS makes no claim of error with respect to the award for $45,340, we need not address whether the AHC properly awarded a MO HealthNet payment.

hearing supporting two of the bases: (i) that Peace of Mind failed to make documentation relating to MO HealthNet participants and payments available where the services were rendered, and (ii) that Peace of Mind breached the terms of the MO HealthNet provider agreement by failing to retain copies of records. The AHC rejected the DSS's other two bases for sanctions.[9] Neither DSS nor Patton disputes the AHC's conclusion that Peace of Mind committed the two violations found by the AHC.

The AHC's second step in its analysis was to determine the standard for imposing a sanction. Both DSS and Patton agree that the AHC used the correct standard, as found in 13 CSR 70–3.030(4): "Any one (1) or more of the following sanctions *may* be invoked against providers for any one (1) or more of the program violations specified in section (3) of this rule . . . ." (Emphasis added.) DSS and Patton also agree that this standard gives DSS, and therefore the AHC on appeal from DSS's decision, discretion as to whether to impose a sanction or not. In other words, DSS and Patton agree that the finding of a violation does not require the imposition of sanctions. In determining whether to impose a sanction, the AHC is guided by 13 CSR 70–3.030(5)(A), which lists five relevant factors for the AHC to consider.[10]

The first factor is the seriousness of the offense, specifically "whether or not an overpayment (that is, financial harm) oc-curred to the program, whether substandard services were rendered to MO Health-Net participants, or circumstances were such that the provider's behavior could have caused or contributed to inadequate or dangerous medical care for any patient(s) or a combination of these." 13 CSR 70–3.030(5)(A)1. The AHC concluded that Peace of Mind failed to retain records and produce them for review by DSS, which constituted a technical overpayment as that term is defined by DSS regulation,[11] but Patton's testimony revealed a plausible explanation that some of the records were lost in a flood, and DSS "[made] no argument that the services were not provided or that Patton committed any fraud." The AHC found "no evidence of any substandard services or any behavior by Patton that could have caused or contributed to inadequate or dangerous medical care for any patients."

The second factor is the extent of the violations committed by the MO Health-Net provider. The extent of the violations is "measured by, but not limited to, the number of patients involved, the number of MO HealthNet claims involved, the number of dollars identified in any overpayment and the length of time over which the violations occurred." 13 CSR 70–3.030(5)(A)2. The AHC noted that the evidence established that Peace of Mind failed to produce records supporting 7,684 claims for twenty-seven patients, and the MO HealthNet payments for those claims

---

**9.** DSS also asserted that Peace of Mind violated 13 CSR 70.92.010(3), a DSS regulation that requires all MO HealthNet providers to have a nurse on duty at all times, and that Peace of Mind failed to maintain a medical model license, a MO HealthNet program requirement. The AHC rejected these allegations of MO HealthNet violations.

**10.** 13 CSR 70–3.030(5) requires DSS, or the AHC on review, to consider six factors in determining whether to impose a sanction. The sixth factor, "[a]ctions taken or recommended by peer review groups, licensing boards or Professional Review Organizations (PRO) or utilization review committees," was irrelevant to Peace of Mind.

**11.** An overpayment occurs when the provider fails to produce adequate documentation to support the claims for services rendered. *See* 13 CSR 70–3.130(1)(E).

totaled $487,462.08. The AHC concluded that the extent of the violations was great.

The third factor is the provider's history of prior violations. If the provider has a history of violations, that history "shall be given substantial weight supporting the agency's decision to invoke sanctions." 13 CSR 70–3.030(5)(A)3. Similarly, the fourth factor is the prior imposition of sanctions and requires the agency, or the AHC on review, to "consider more severe sanctions in cases where a provider has been subject to sanctions" in the past. 13 CSR 70–3.030(5)(A)4. The AHC found that there was no evidence that Peace of Mind had a history of prior violations or sanctions.

The fifth factor concerns whether DSS previously provided education to the provider. If the provider has merely committed billing violations and has not been offered provider education, then sanctions may be mitigated. 13 CSR 70–3.030(5)(A)5. The AHC did not consider this factor because there was no evidence presented at the hearing as to whether Patton received provider training.

After considering the five relevant factors, the AHC declined to sanction Peace of Mind. In making its decision, the AHC noted that 13 CSR 70–3.030(4) gave it discretion to impose sanctions. The AHC concluded that terminating Peace of Mind's status as a MO HealthNet provider was not warranted as a sanction because "there [had] been no allegation or showing that Peace of Mind provided substandard services, committed any fraud, or failed to perform any service for which she received payment." [12] Also, the AHC refused to subject Peace of Mind to an overpayment sanction, as Patton presented calendars at trial to demonstrate that Peace of Mind provided services and Patton's testimony established that she had already suffered a great financial loss as a result of the termination of Peace of Mind's provider status. Finally, the AHC determined that the other sanctions were inappropriate because Peace of Mind was no longer in business and thus was no longer billing MO HealthNet for services.

■ The Departments' fourth point relied on argues that the AHC's failure to impose sanctions on Peace of Mind constituted an abuse of discretion. We disagree. The AHC abuses its discretion " 'when the ruling is clearly against the logic of the circumstances then before the [AHC] and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *Veterans of Foreign Wars Post 6477 v. Mo. Gaming Comm'n,* 260 S.W.3d 388, 392 (Mo.App. W.D.2008) (quoting *Edwards v. Mo. State Bd. of Chiropractic Exam'rs,* 85 S.W.3d 10, 23 (Mo.App. W.D.2002)). Here, the AHC's decision revealed that the AHC considered the evidence put forth at the hearing and then, following DSS's own regulations, exercised discretion in making its decision. The AHC's decision is not "clearly against the logic of the circumstances," as there was evidence presented at trial to support its analysis of the five factors. The AHC used its decision to explain its findings with respect to each of the five factors,

---

12. As discussed *supra,* the AHC was not suggesting that the Departments have an obligation to prove that services were not provided or that Patton committed fraud as a condition for the imposition of sanctions. Instead, the AHC simply noted that DSS presented no evidence that services were not provided or that Patton committed fraud. If, in the future, DSS alleges that services were not provided or that a participant committed fraud, DSS is free to introduce evidence at the AHC hearing proving its allegations. Acceptable evidence supporting its allegations would include, but not be limited to, a provider's records, DSS's records, or testimony from staff or patients regarding the services rendered.

citing evidence that was presented at the hearing. There is nothing "arbitrary and unreasonable" about considering the evidence presented at the hearing, using the discretion given to it by DSS's regulations, and then reaching a different result than DSS.[13] On the contrary, that is the task given to the AHC.

In the argument portion following its fourth point relied on, DSS argues that the AHC committed legal error by observing in its decision that "DSS makes no argument that the services were not provided or that Patton committed any fraud." DSS argues that the AHC placed an affirmative burden on DSS to prove a negative—that the services were not rendered—as an essential condition to imposing sanctions. Assuming, *arguendo*, that DSS has preserved this argument for our review,[14] a cursory reading of the AHC's decision reveals that this argument is without merit. The AHC merely noted in its discussion of the seriousness of the offense—one of the five relevant factors to be considered in exercising the discretion to impose sanctions—that there was no evidence to support a finding that Peace of Mind failed to provide services or that Patton committed fraud in billing MO HealthNet for the adult day care services provided. This is a legitimate factor to be considered. Nothing in the AHC's deci-

sion suggests that the AHC held that proof that billed services were not rendered was a condition to imposing sanctions as a matter of law.

Point four is denied.

■ DSS also argues in its third point that the AHC "erred when it found only two bases to sanction Patton because that decision is unauthorized by law in that it relies on legally erroneous findings and analysis concerning [DSS's] three other bases for sanctioning Patton." In the argument supporting the third point relied on, DSS contends that the AHC should have found three additional bases for sanction: (1) Peace of Mind's failure to verify its provision of services with adequate documentation; (2) Peace of Mind's failure to make records available to DSS on a timely basis; and (3) Peace of Mind's failure to employ a nurse. DSS asserts that the AHC's rejection of those bases for sanction was "unauthorized" in that it relied on "legally erroneous findings."

DSS's argument has no practical relevance. The AHC found that Peace of Mind committed two violations that could serve as a basis for sanctions and, using its own discretion after considering the five relevant factors, concluded that Peace of Mind was not subject to sanctions. Ac-

---

13. The crux of the Departments' fourth point relied on is that the AHC did not exercise its discretion the same way that DSS did. By drafting its regulations to give itself discretion to impose sanctions, the DSS inherently gave the AHC discretion on appeal as well. *See Mellas*, 220 S.W.3d at 783 ("The [AHC] actually steps into the department's shoes and becomes the department in remaking the department's decision. This includes the exercise of any discretion that the department would exercise."). If DSS would prefer the AHC to reach the same decision with respect to sanctions that it did, DSS should have written 13 CSR 70–3.030 to make sanctions mandatory.

14. The Departments do not put forth a point relied on that argues the AHC committed legal error by observing that DSS made no argument that Peace of Mind did not provide services or committed fraud. Instead, the AHC includes its contention in the argument portion following point four. "The argument shall be limited to those errors included in the 'Points Relied On.'" Rule 84.04(e). An argument that is not included within the points relied on is not preserved for appeal. *Coburn v. Mayer*, 368 S.W.3d 320, 326 n. 4 (Mo.App. W.D.2012).

cording to 13 CSR 70–3.030(5)(A), though the severity of a violation is a factor, the *number* of violations is not a factor to be considered in determining whether the MO HealthNet provider is subject to sanctions. The additional bases for sanctioning Peace of Mind not found to be meritorious by the AHC have neither been argued nor demonstrated by DSS as material to the AHC's exercise of its discretion not to impose sanctions. Moreover, the first and second additional bases are not materially distinguishable from the violations found by the AHC. And the third additional basis (addressing whether Patton employed a nurse) was largely influenced by the AHC's credibility determination as to Patton's testimony—a determination to which we are bound to defer.

Point three is denied.

### The AHC Decision With Respect to DHSS (Points One and Five)

The AHC reached three conclusions relevant to DHSS: (1) that Peace of Mind is entitled to a participation agreement with DHSS for home- and community-based care; (2) that Peace of Mind "raised and preserved [its] constitutional claim [that DHSS's actions were the result of a racially discriminatory animus toward Patton] for appellate review in the court system"; and (3) that DHSS acted with a racially discriminatory animus toward Patton. DHSS challenges each of those conclusions.

*Participation Agreement for Home- and Community–Based Services*

▉ The Departments' fifth point relied on argues that the AHC erred in finding that Peace of Mind is entitled to a participation agreement with DHSS. The Departments claim that, according to regulations, a condition of the DHSS participation agreement is participation in the MO HealthNet program. The Departments explain that because Peace of

Mind's Title XIX MO HealthNet provider agreement was terminated in April 2009, Peace of Mind's DHSS participation agreement was also terminated. Thus, according to the Departments, the AHC's finding that Peace of Mind is entitled to a DHSS participation agreement was legal error.

DHSS made the same argument to the AHC, which characterized the argument as "misdirected." At the AHC hearing, DHSS relied on 13 CSR 70–92.010(3)(D), which states: "The provider of adult day health care services must have a signed MO HealthNet participation agreement in effect with the Department of Social Services." The AHC dismissed 13 CSR 70–92.010(3)(D) as irrelevant because it was a DSS, not a DHSS regulation. DHSS also supported its argument at the AHC with reference to 19 CSR 15–7.010(1)–(2). That regulation requires service providers to meet "all applicable state and local licensure and safety requirements" as well as "maintain any licensure, certification or registration mandated by any state or local government, body or board." The AHC found that DHSS's reliance on 19 CSR 15–7.010(1)–(2) was flawed because that regulation related to licensure requirements, not DHSS participation agreements.

The AHC added that, even if the regulations on which DHSS relied required a MO HealthNet provider agreement as a prerequisite for a DHSS participation agreement, Peace of Mind was not subject to the sanction of termination of the MO HealthNet agreement. Thus, according to the AHC's decision, the condition precedent for the DHSS participation agreement—a MO HealthNet agreement—existed, and DHSS should not have terminated its participation agreement with Peace of Mind. Thus, the AHC's decision concluded that

644

Peace of Mind was entitled to a DHSS participation agreement.[15]

The AHC's decision that Peace of Mind is entitled to a DHSS participation agreement is a legal conclusion that we are required to review *de novo*. On appeal, the Departments argue that "[p]articipation in the MO HealthNet adult day health care program is a condition of [DHSS's] participation agreement" and cites the language of the participation agreement as support for its statement. The DHSS participation agreement provides, in relevant part, that the purpose of the agreement is "[t]o provide for the delivery of adult day health care (ADHC) services authorized by [DHSS] to clients attending licensed adult day care programs operating pursuant to Sections 660.400 to 660.420, RSMo, 19 CSR 30–90.010 *et seq.*, 13 CSR 70–92.010, and the requirements of this Agreement." The statutes cited and 19 CSR 30–90.010 *et seq.* concern the licensure of adult day cares, not DHSS participation agreements. And 13 CSR 70–92.010 is a DSS regulation, not a DHSS regulation, so it does not concern DHSS participation agreements either.

A fair reading of the statutes and regulations cited in the purpose statement does not permit the conclusion that a MO HealthNet provider agreement is a condition precedent for the DHSS participation agreement. And the DHSS participation agreement itself contains no such condition

precedent. In fact, the DHSS participation agreement appears to contemplate a situation in which an adult day care provider may not have a MO HealthNet provider agreement but would still have a DHSS participation agreement. *See, e.g.,* Section 3.2 ("The Department will only pay for adult day health care delivered on dates of MO HealthNet *ineligibility* on which the client received authorized services." (Emphasis added)).

Even if the DHSS participation agreement or the statutes or regulations applicable to DSS required Peace of Mind to have a MO HealthNet provider agreement as a condition to having a DHSS participation agreement, the Departments' fifth point is rendered moot in light of our decision that the AHC did not err in concluding that Peace of Mind's status as a MO HealthNet provider should not have been terminated. The AHC effectively held that because Peace of Mind should always have had a MO HealthNet provider agreement, DHSS had no basis on which to terminate Peace of Mind's DHSS participation agreement.

Point five is denied.

*Preservation of Constitutional Issue and the AHC's Finding that DHSS Acted with Discriminatory Animus*

The AHC's decision reached three conclusions with respect to constitutional issues present in Patton's appeal of DHSS's actions.[16] First, the AHC concluded that

**15.** The AHC also included two ancillary discussions under the umbrella of whether Peace of Mind was entitled to a DHSS participation agreement. The AHC concluded that DHSS failed to follow its own procedural requirements after the December 5, 2008, inspection of Peace of Mind. The AHC also concluded that DHSS should not have revoked Peace of Mind's adult day care license on July 7, 2009, for failing to maintain an ongoing business, as the revocation of the license was premised on the MO HealthNet sanctions that the AHC

overturned. The Departments do not challenge these conclusions.

**16.** The language chosen by the AHC in its decision was equivocal. In each of its "conclusions" regarding the constitutional issues, the AHC chose to use the word "consider" rather than "conclude." Neither the Departments nor Patton claim that the AHC's use of "consider" rendered *its decision with respect* to the constitutional issues ambiguous. Instead, both the Departments and Patton agree that the AHC's decision declared that Patton

Patton's testimony that Blum called her a racial epithet and said that Patton was illiterate was sufficient to assert a constitutional claim that "DHSS's actions were the result of a racially discriminatory animus and that DHSS's actions deprived Patton of due process and equal protection of the laws." Second, the AHC concluded that Patton raised and preserved her constitutional claim for judicial review. Third, the AHC concluded that "DHSS ... acted with a racially discriminatory animus toward Patton, and we construe the law consistently with the state and federal constitutions."

The Departments' first point on appeal presents three claims of error. First, the Departments argue that the AHC erred in finding that Patton raised and preserved her constitutional issue for appeal, as the complaints she filed before the AHC did not claim racial animus by DHSS or facts from which racial animus by DHSS could be found. The second claim of error is related: the Departments contend that, because Patton did not properly raise the constitutional issue, the AHC improperly raised the claim *sua sponte* in its decision. Third, the Departments argue that the AHC's conclusion that DHSS acted with discriminatory animus toward Patton is not supported by the law.

Before analyzing DHSS's claims of error, we observe that each of the AHC's conclusions, summarized, *supra*, is a derivative of the AHC's factual finding that Blum called Patton a racial epithet and illiterate. Because this factual finding is necessarily a function of the AHC's express determination that Patton was a credible witness, we defer to the finding. *Funk*, 306 S.W.3d at 105. However, we

are nonetheless required to review *de novo* the AHC's legal conclusions drawn from this factual finding. *Id.*

▮ In order to preserve a constitutional issue for review, " 'a party must: (1) raise it at the first available opportunity; (2) designate specifically the constitutional provision claimed to have been violated; (3) state the fact showing the violation; and (4) preserve the constitutional question throughout for appellate review.' " *Lewis v. Dep't of Soc. Servs.*, 61 S.W.3d 248, 254 (Mo.App. W.D.2001) (quoting *Laubinger v. Laubinger*, 5 S.W.3d 166, 173 (Mo.App. W.D.1999)). The "first available opportunity" is determined by the specific facts of the case. *Duncan v. Mo. Bd. for Architects, Prof'l Eng'rs & Land Surveyors*, 744 S.W.2d 524, 531 (Mo.App. E.D. 1988). If the constitutional question is not properly raised, then it is waived. *Lewis*, 61 S.W.3d at 254.

We seriously question whether Patton raised her constitutional claim at the "first available opportunity." The complaints Patton filed with the DHSS did not include allegations—either explicit or implied—of DHSS acting with a discriminatory animus toward Patton. In fact, there is no evidence in the record as a whole that Patton ever registered a complaint or concern with DHSS that Blum had called her a racial epithet and illiterate. In contrast, the record as a whole leads to the inescapable conclusion that the first time this complaint was registered was during Patton's testimony. This does not appear to comport with the obligation to raise a constitutional claim at the first available opportunity.

had raised and preserved her constitutional claims against DHSS and that DHSS acted with a racially discriminatory animus toward Patton. Because the parties to this appeal

agree as to the interpretation of the AHC's decision, we will adopt their understanding for the purpose of this decision.

However, we are not persuaded that the Departments preserved an objection to Patton's late assertion of a constitutional claim. The Departments did not object to Patton's testimony as untimely. Instead, the Departments took the position at hearing that the AHC did not have "jurisdiction" to decide the constitutional issue being raised by Patton.[17] *See* transcript at 169 ("[D]iscrimination is not something that, or constitutional issues are not something that this Commission has the jurisdiction over, and case law sets forth that the first notice to raise constitutional issues would be at the circuit court level, not at this level. And so by not testifying here they're not waiving their first availability to introduce evidence. The factual record would be made on the circuit court level where the court has jurisdiction over it."). This objection suggested that Patton was required to wait to assert her constitutional claim—a position in inherent conflict with the position taken by the Departments on appeal.

■ We need not determine whether Patton's testimony was sufficient to raise and preserve a constitutional claim or whether the AHC acted *sua sponte* in addressing the constitutional claim because we find in any event that the AHC's conclusion that DHSS acted with discriminatory racial animus toward Patton was legally erroneous.

The AHC concluded that DHSS, **as an agency,** acted with a racially discriminatory animus toward Patton. The only evidence in the record to support this legal conclusion was the testimony by Patton that a single DHSS employee, Blum, directed a deplorable racial epithet toward Patton and called her illiterate. There was no evidence presented at trial that Blum's statements could be legally attrib-

uted to DHSS as a whole or that DHSS was even aware that the comments were made. Evidence that a single agency employee made a racial remark to Patton is insufficient as a matter of law to support a conclusion that the entire agency thereafter acted in its handling of Patton with racial animus. *See James v. City of Jennings,* 735 S.W.2d 188, 191 (Mo.App. E.D. 1987). Even if the single (and wholly unacceptable) comment by Blum could be legally attributed to DHSS, standing alone that comment does not rise to the level of a constitutional violation in the absence of other evidence connecting the comment to subsequent agency action. *DeWalt v. Carter,* 224 F.3d 607, 612 (7th Cir.2000) ("The use of racially derogatory language, while unprofessional and deplorable, does not violate the [U.S.] Constitution."); *Blades v. Schuetzle,* 302 F.3d 801, 805 (8th Cir.2002) ("[W]e believe that the use of racially derogatory language, unless it is pervasive or severe enough to amount to racial harassment, will not by itself violate the fourteenth amendment."). The AHC erred in finding otherwise.

The Departments do not argue that the AHC's error in finding that the DHSS acted with racially discriminatory animus requires reversal of all other conclusions reached by the AHC affecting DHSS. And in any event, as we have already discussed, the AHC's conclusion claimed to be erroneous in the Departments' fifth points relied on is defensible, independent of the AHC's finding on Patton's constitutional claim. Thus, although we agree with that the AHC committed legal error in finding that DHSS acted with racial animus toward Patton thus violating her constitutional rights, that conclusion was harmless.

Point one is granted.

17. The Departments completely abandoned this argument on appeal.

## Conclusion

We reverse the trial court's judgment insofar as it upholds the AHC's conclusion that DHSS acted with a racially discriminatory animus towards Patton. We affirm the trial court's judgment insofar as it affirms the AHC's conclusion in every other respect.

All concur.