PUBLIC COMMUNICATIONS SER-
VICES, INC., et al., Appellants–
Respondents,

v.

Kelvin L. SIMMONS, Commissioner of
Administration, et al., Respondents–
Appellants.

Nos. WD 74740, WD 74769.

Missouri Court of Appeals,
Western District.

Sept. 24, 2013.

James R. Layton, Jefferson City, MO, for appellant.

Heidi D. Vollett, Jefferson City and Lowell D. Pearson, Jefferson City, for respondent.

Before Division One: MARK D. PFEIFFER, P.J., VICTOR C. HOWARD and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Public Communication Services, Inc. ("PCS") filed suit in the Circuit Court of Cole County to challenge the lawfulness of the State's award of a contract to Securus Technologies, Inc., to provide telephone services to inmates in Missouri prisons. PCS was the incumbent contractor at the time of the award. PCS alleges that the award to Securus was unlawful because the State failed to solicit competitive bids with respect to certain optional services Securus offered to provide, at an additional cost. PCS also contends that, in selecting Securus as the lowest and best bidder for the offender telephone services contract, the State acted arbitrarily and capriciously by failing to consider Securus' proposed per-transaction fee for prepaid accounts.

Following a bench trial, the circuit court rejected PCS' claims, and entered judgment for the State and for Securus. PCS appeals.

## Factual Background

From 2005 to 2011, PCS held the contract to provide telephone services for inmates housed in facilities run by the Missouri Department of Corrections ("DOC"). The contract serves more than 30,000 inmates; it also serves the friends and families of those inmates. PCS' contract was set to expire in May of 2011.

Prior to the expiration of PCS' contract, the Office of Administration's Division of Purchasing and Materials Management (the "Purchasing Division") issued a request for proposals ("RFP") for a new five-year contract, with two optional one-year extensions. The RFP required that bid-

ders have the ability: to handle a large volume of inmate telephone calls; to accept various methods of payment; to integrate with DOC's system for handling inmate accounts; and to monitor and record inmate telephone calls. The RFP required that inmates be able to pay for telephone calls in three ways: by placing collect calls for which the recipient would agree to pay; by debit to an inmate account; or by debit to a prepaid account established by persons outside the prison.

The RFP specified the manner in which proposals would be evaluated. The RFP stated that "[a]fter determining that a proposal satisfies the mandatory requirements, the evaluator(s) shall use both objective analysis and subjective judgment in conducting a comparative assessment of the proposal in accordance with the evaluation criteria stated below." The RFP then listed four evaluation criteria: Cost Evaluation (90 points); Experience/Reliability of Organization (20 points); Proposed Method of Performance, Solution Functionality and Expertise of Personnel (80 points) (the "Method of Performance" factor); and MBE/WBE Participation (10 points). The RFP also provided a preference of ten "bonus points" for bidders that were, or proposed to utilize, organizations for the blind and sheltered workshops. The RFP specified formulae for the Cost Evaluation, MBE/WBE Participation, and Organization for the Blind and Sheltered Workshop criteria; it also specified, however, that evaluation of the Experience/Reliability of Organization, and the Method of Performance factor, "shall be subjective based on fact."

The formula for evaluating the cost criterion was based on an assumed number of calls and minutes, and an assumed number of collect calls, based on PCS' recent experience. The RFP specified that these volume measures would be multiplied by the per-minute cost for collect, prepaid, and debit calls proposed by the offeror, and by the offeror's proposed collect-call set-up charge. The RFP also required bidders to specify any one-time or per-transaction setup fees for prepaid accounts. Even though the volume of calls paid for with prepaid accounts had surpassed the number of collect calls and inmate-account debit calls in the preceding years, the cost-evaluation formula did not consider these prepaid account set-up fees. Instead, the RFP stated that, "[i]f the offeror provided pricing for the pre-paid account set-up fee, the state reserves the right to subjectively evaluate the proposed pre-paid account set-up fee as part of the proposed method of performance, solution functionality, and expertise of personnel since estimates of the number of pre-paid account transactions [are] unable to be determined."

Under a heading titled "Optional Products and Services," the RFP stated that "[t]he contractor should provide services for the detection and/or interruption of wireless communications devices, such as cellular telephones and data communications devices within the corrections facilities." This request was based, at least in part, on DOC's concern about unauthorized cellular phones being smuggled into prison facilities. The RFP contained no specific requirements as to the "detection and/or interruption" services the offeror should propose. The RFP also stated that "[t]he offeror may also provide pricing for an increase in the firm, fixed per minute call rate ... for any other optional products and services proposed by the offeror." The Purchasing Division made no commitment in the RFP that it would contract or pay for any of the optional services. Instead, the RFP stated that, "[i]f the offeror provided pricing for an[y] optional products and services, including but not limited to cell phone detection and/or interruption, the state reserves the right to subjectively

evaluate availability and cost of the proposed optional products and services as part of the proposed method of performance, solution functionality, and expertise of personnel."

Before responses to the RFP were due, PCS employees met with a Purchasing Division official to express their concerns about the RFP's open-ended invitation to bidders to propose "optional products and services." PCS was concerned that bidders' potential inclusion of optional services in their proposals would make it difficult, if not impossible, for the Purchasing Division to fairly compare the bids it received. PCS' employees came away from the meeting with the understanding that, if the State found any of the proposed "optional" services sufficiently desirable to include in the final contract, the State would modify the RFP through the "best and final offer" ("BAFO") process. *See* § 34.042.3, RSMo. A BAFO request would amend the RFP to include additional mandatory items on which proposals were not initially solicited, to allow each offeror to amend its proposal to bid on any "optional" services the Purchasing Division desired to acquire.

Seven companies submitted bids that met the RFP's mandatory requirements, PCS and Securus among them. Securus' bid proposed a $.05 per-minute charge for collect, pre-paid and debit calls. It also offered to provide four optional services, each priced at an additional $.01 per minute: a biometric tool that could be used for voice recognition in call monitoring; an offender voicemail system to allow family members of inmates to leave messages; an enhanced investigative personnel package that would have increased the size of the staff tasked with monitoring inmate telephone calls; and Securus' proposal for cell phone detection and interruption, which was essentially a proposal to assist the State in finding a vendor capable of implementing such a program. PCS points out that it offered to provide DOC with voice biometrics and fully staffed monitoring at its base rate of $.07 per minute—services that Securus included as "optional." It also points out that several other companies included services in their base rates that Securus offered as "optional." The Purchasing Division did not use the BAFO process to solicit more specific proposals from the bidders with respect to these optional services.

Securus proposed a $6.95 per-transaction set-up fee for prepaid accounts, the highest of any bidder. Its proposal specified, however, that "[f]riends and family members who pay by check or money order will not be subject to a Set–Up Fee." PCS proposed a $5.00 per-transaction set-up fee. PCS' proposal did not limit the prepaid account transactions to which its fee would apply.

The Purchasing Division evaluated the cost of each proposal using the formula outlined in the RFP: it multiplied each company's per-minute rate by the estimated annual call minutes, and multiplied each bidders' set-up charge for collect calls by the estimated annual volume of such calls. The lowest priced offer came from Talk Telio, at $.05 per minute, with no collect-call fees. Securus also offered $.05 per minute, but included a $1.00 fee for initiating each collect call. PCS' bid was for $.07 per minute and included a $.25 fee for each collect call. Based upon pricing alone, Talk Telio received 90 cost points, the maximum. Securus received 72 cost points, and PCS received 61 cost points.

All of the proposals received 10 points for MBE/WBE participation, and 10 points on the blind/sheltered workshop preference.

An evaluation committee composed of officials from DOC and from the Office of

Administration also evaluated each proposal on a subjective basis. PCS and Securus scored much higher in the subjective evaluation than Talk Telio, and as a result, ended up surpassing Talk Telio in the final evaluation. Both PCS and Securus received the maximum number of points for reliability and experience (20 points). Securus and PCS also received almost identical scores on the Method of Performance factor (78 and 77 points respectively). Based upon the combination of subjective and objective evaluations, Securus was the winning bidder (PCS' bid was fourth).

Although many of the bids included fees assessed for depositing money into prepaid calling accounts (including Securus' per-transaction fee of $6.95, the highest of any bidder), the evaluation committee did not assign a specific weight to those fees in either its objective or subjective evaluations. The evaluation committee also did not evaluate the cost or reliability of the optional services suggested by any of the bidders, including the cellular phone detection and interruption services on which the RFP had specifically requested each bidder to make a proposal.

On June 28, 2011, the Purchasing Division issued a "Notice of Award" accepting Securus' proposal. The Notice of Award stated:

> The proposal submitted by Securus Technologies, Inc. in Response to [the RFP] is accepted in its entirety including their response to Best and Final Offer # 001 and the email clarification from Steven Cadwell of Securus Technologies dated May 26, 2011.

Following the award of the contract to Securus, PCS submitted a timely bid protest letter. PCS argued that the State's award was arbitrary and capricious because it failed to conduct a fair comparison of the proposals submitted by the bidders. PCS also argued that the State's failure to weigh the prepaid account fees was arbitrary and capricious. The Office of Administration denied PCS' bid protest on August 22, 2011.

On August 18, 2011, PCS and two individuals filed suit against the Office of Administration and the Purchasing Division under § 536.150 and chapter 34, RSMo. PCS alleged that the contract award to Securus was arbitrary and capricious because: (1) the State failed to rationally weigh the various vendors' proposals because the contract between Securus and the State included optional services that were not put out for competitive bid; (2) Securus' cell phone detection and interruption proposal was an unlawful attempt to circumvent chapter 34's mandatory procurement laws, and delegate the Office of Administration's procurement authority to Securus; and (3) the State failed to rationally weigh any of the bidders' prepaid account fees. On September 1, 2011, Securus was granted leave to intervene.

The case was tried to the court.[1] On November 30, 2011, the trial court issued its final judgment rejecting PCS' challenges to the contract award. The trial court's judgment finds that the bidders' prepaid account fees, and the cost of Securus' proposed optional services, were not considered in the objective cost evaluation. In addition, the judgment finds that

> [t]he record is undisputed that the Evaluation Committee did not subjectively weigh the amount of pre-paid account transaction fees or the cost or quality of the optional services of any bidder. In other words, no bidder was given more

---

1. By the second day of trial—October 13, 2011—Securus had already begun implementing the contract. By the time the trial court issued its final judgment, Securus was providing offender telephone services in all of the facilities operated by DOC.

or less points based on the amount of fees they charged or the quality or cost of the optional services they proposed. (Record citations omitted.) The judgment finds that "[n]either the Office of Administration nor the Department of Corrections undertook *any efforts to determine whether the optional services that Securus offered could be obtained at a better price,*" and that "PCS presented credible evidence at trial that each of the optional services that Securus offered to provide at an additional cost of $8.2 million over the course of the contract term could be provided by another vendor at significantly lesser costs than Securus."

The judgment also finds that, *if* the cost of Securus' proposed optional services, or the various bidders' prepaid account fees, had been considered in the objective cost evaluation, the results of the bidding process would have been different:

52. The point total in favor of Securus did not take into account the cost of the four optional services that were included in the Securus proposal at a total cost of an additional $0.04 per minute, and it did not take into account the fact that other bidders offered some of those same services at no extra cost or at a cost below that proposed by Securus.

53. If [the Purchasing Division] had considered the costs of Securus' optional services in the cost calculation and compared Securus on a fair and equal basis with other offerors who included comparable proposals, Securus would not have had the highest point total. PCS would have been number one with 206.5 points and would have been awarded the new contract because it submitted the lowest and best bid if the bids had been evaluated on the same basis. Securus would have come in sixth, after PCS, Unisys, and three of the Century Link proposals.

54. Even if the optional services were not at issue, Securus would not have had the highest point total if [the Purchasing Division] had considered the amount of the pre-paid account transaction fees in the cost calculation. Securus had the highest fees—$6.95 per transaction—and Talk Telio had no fees. Other bidders were in between. If the only change to [the Purchasing Division's] cost evaluation were to take into account the cost of the pre-paid account transaction[s], Talk Telio would have been number one with 187 points, and Securus would have come in second with 180 points.

(Record citations omitted).

Despite making these factual findings, the trial court's judgment nevertheless rejects PCS' challenges to the contract award. The court found that the State's acceptance of Securus' proposal did not include the $.04 per minute in "optional" services proposed in Securus' bid, and therefore did not constitute a procurement of those optional services in violation of the competitive bidding laws. The testimony of certain Office of Administration and DOC employees suggested that the Purchasing Division could amend the Securus contract, post-award, to add the optional services. The trial court rejected this suggestion.

[The RFP's] solicitation of optional services without specifying the type of optional services in which the State had an interest was in violation of Section 34.040, RSMo's requirement that bids be based on standard specifications. If [the Purchasing Division] were allowed in a bid document to do what it did in the RFP, which was effectively to ask offerors to propose any optional services each offeror individually might propose and then to select the optional services offered by one bidder, without giving other bidders the chance to make an

offer on the same terms, it would create an exception to Chapter 34's competitive bidding requirements that would threaten to swallow the rule and undermine the entire competitive bidding scheme.

Based on its legal determinations that the optional services proposed by Securus *had not been* accepted in the Notice of Award, and that those services *could not be* purchased by simply amending the Securus contract, the trial court's judgment declares that "[t] he optional services offered by Securus in its proposal are not included in [the contract] and cannot be awarded to Securus in the future without reletting the entire contract for competitive bidding or competitive proposals." The judgment also provides that "[d]efendants are enjoined from adding the optional services to [the contract]. If the optional services are desired, the entire contract must be relet."

The trial court also rejected PCS' claim that the failure to evaluate Securus' prepaid account transaction fees rendered the contract award unlawful. "The RFP stated that the State reserve[d] the right' to evaluate the pre-paid account transaction fees as part of the subjective evaluation, and it was not obligated to exercise that right for the base contract to be valid."

PCS appeals. Securus filed a cross-appeal to argue that PCS and the other plaintiffs lacked standing to challenge the contract award.

## Standard of Review

Judicial review of a noncontested administrative decision is governed by section 536.150. In noncontested cases, the circuit court does not utilize the competent and substantial evidence test employed in reviewing contested agency decisions. Instead, the circuit court conducts a broader de novo review in which it hears evidence on the merits of the case, makes a record, determines the facts, and decides whether, in view of those facts, the agency's decision is unconstitutional, unlawful, unreasonable, arbitrary, capricious, or otherwise involves an abuse of discretion. The circuit court does not defer to facts found or credibility assessed by the agency and need not conform doubtful evidence to the agency's decision. The court shall not substitute its discretion for discretion legally vested in the administrative agency.

On appeal, the appellate court reviews the judgment of the circuit court, not the decision of the administrative agency. Appellate review of the circuit court's judgment in a noncontested case is essentially the same as the review for a court-tried case. Thus, the scope of appellate review is governed by Rule 73.01 as construed in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). Accordingly, the appellate court reviews the circuit court's judgment to determine whether its finding that the agency decision was or was not unconstitutional, unlawful, unreasonable, arbitrary, capricious, or the product of an abuse of discretion rests on substantial evidence and correctly declares and applies the law.

*Mo. Nat'l Educ. Ass'n v. Mo. State Bd. Of Educ.,* 34 S.W.3d 266, 274–75 (Mo.App. W.D.2000) (citations omitted).

## Analysis
### I.

■ As a threshold matter, Securus argues PCS lacked standing, as an unsuccessful bidder, to bring this suit.[2] We disagree.

2. In its cross-appeal, Securus also challenges the standing of individual plaintiff Brian

Duty. Given our conclusion that PCS has standing to challenge the contract award, we

■ "Courts have a duty to determine if a party has standing prior to addressing the substantive issues of the case. For this reason, standing cannot be waived." *CACH, LLC v. Askew,* 358 S.W.3d 58, 61 (Mo. banc 2012) (citing *Farmer v. Kinder,* 89 S.W.3d 447, 451 (Mo. banc 2002)); *see also, e.g., State ex rel. St. Louis Retail Grp. v. Kraiberg,* 343 S.W.3d 712, 715–16 (Mo.App. E.D.2011).[3] Whether or not an Appellant has standing is an issue of law which we review *de novo. Manzara v. State,* 343 S.W.3d 656, 659 (Mo. banc 2011).

As Securus notes, multiple Missouri cases have held that a disappointed bidder competing for a government contract does not have a special pecuniary interest in the award of the contract to it, and therefore generally lacks standing to challenge the award of the contract to another bidder. *See, e.g., State ex rel. Johnson v. Sevier,* 339 Mo. 483, 98 S.W.2d 677, 679 (1936); *State ex rel. Mid–Mo. Limestone, Inc. v. Cnty. of Callaway,* 962 S.W.2d 438, 441–42 (Mo.App. W.D.1998); *Metcalf & Eddy Servs., Inc. v. City of St. Charles,* 701 S.W.2d 497, 499 (Mo.App. E.D.1985); *La Mar Const. Co. v. Holt County, R–II School Dist.,* 542 S.W.2d 568, 570–71 (Mo. App.1976). The Missouri Supreme Court has explained that

> [t]his is so for two reasons: (1) Because the advertisement was not an offer of a contract, but an offer to receive proposals for a contract, and (2) because the statute requiring that contracts be let to the lowest and best bidder was designed for the benefit and protection of the public and not the bidders.

*Sevier,* 98 S.W.2d at 679 (citation and internal quotation marks omitted).

■ Despite the general rule refusing to afford losing bidders standing to challenge the award of government contracts, Missouri decisions recognize that members of the public have standing to challenge a contract award where the contracting authority exercises its discretion to solicit and evaluate bids unlawfully or capriciously. Thus, *La Mar* explains that

> [t]he rejection of the lowest bid must not be made fraudulently, corruptly, capriciously or without reason. The officials must exercise and observe good faith and accord all bidders just consideration, avoiding favoritism and corruption. If any of these standards are violated the public, as the real, moving party, may bring mandamus to enforce cancellation of the contract and its award to the lowest responsible bidder.

542 S.W.2d at 571 (citations omitted); *see also Sevier,* 98 S.W.2d at 678 ("The State Purchasing Agent owed a duty to the public to honestly and fairly exercise his discretion to award the contract in question to the lowest and best bidder. If he failed to lawfully perform that duty, his action in the matter could be reached and controlled by mandamus.").

Relying on this principle, the United States Court of Appeals for the Eighth Circuit has held that an unsuccessful bidder has standing to challenge a contract award under Missouri law "if the bidding procedure did not permit all bidders to compete on equal terms." *Metro. Exp. Servs., Inc. v. City of Kansas City,* 23 F.3d 1367, 1371 (8th Cir.1994). In *Mid–Missouri Limestone,* 962 S.W.2d 438, this Court recognized the Eighth Circuit's holding in *Metropolitan Express Services,*

---

need not separately consider Mr. Duty's standing. We also note that the State has not joined in Securus' standing arguments.

**3.** Given that standing is a non-waivable issue which we would have an obligation to address *sua sponte,* Securus' cross-appeal was unnecessary.

although we held that a losing bidder lacked standing in the case before us:

> [T]he court in *Metropolitan* noted that the bids were not solicited on an equal basis for all bidders and concluded that "an unsuccessful bidder has standing to challenge a contract that was not *fairly* bid." [23 F.3d at 1371] (emphasis added). In this case, Appellants had an opportunity to bid. Appellants do not contend that these Callaway County bids were not fairly made, and they do not contend that other bids were chosen over theirs for other than valid reasons. The outcome would be different if the rejection of Appellants' bid were made "fraudulently, corruptly, capriciously, or without reason." *La Mar,* 542 S.W.2d 568 at 571.

*Mid–Mo. Limestone,* 962 S.W.2d at 442.

PCS has standing under these decisions. PCS alleges that the Purchasing Division wrongfully awarded Securus a contract which included its proposed optional services, without evaluating the price or quality of those services, and without giving other bidders a fair opportunity to bid on those services. PCS also argues that the Purchasing Division did not fairly evaluate the competing proposals, because it ignored a material element of Securus' proposal: its prepaid account transaction fees. These arguments contend that the Purchasing Division acted arbitrarily, capriciously, unfairly, and in violating of the competitive bidding process established by chapter 34, RSMo. Because PCS' allegations challenge the fairness and lawfulness of the procurement process by which Securus was awarded the offender telephone services contract, it has standing to assert its claims.

## II.

PCS' first Point argues that the contract between the State and Securus is void and of no effect because the State failed to give any analysis, subjective or objective, to the quality or cost of the optional services Securus proposed, and failed to give the other qualified bidders an opportunity to bid on those optional services. Although Securus' bid offered to provide the mandatory services specified in the RFP for a base rate of $.05 per minute, it offered to provide the optional services for an additional $.04 per minute, while other bidders offered some or all of those optional services as part of their base bid. PCS argues that, when the additional cost of Securus' proposed optional services is considered, Securus' proposal was in fact one of the most expensive offered by the bidders.

The circuit court rejected PCS' argument because it concluded that the optional services proposed by Securus did not become part of the contract awarded to it; therefore, the fact that the State failed to evaluate the optional services, or seek competing bids for the supply of those services, was irrelevant.

■ PCS contends that the circuit court erred in finding that the optional services were not part of the contract awarded to Securus, because the Notice of Award stated that Securus' proposal had been "accepted in its entirety." According to PCS, this acceptance can be interpreted in only one way: as accepting *both* the services necessary to meet the RFP's mandatory requirements, *and* the additional, optional services Securus proposed (at an additional cost). We disagree.[4]

4. Although the parties' arguments refer to the relative "cost" of the various bidders' proposals, this contract is unusual in that none of the charges the bidders specified would actually be paid by the State. Instead, those charges would be paid by inmates making

 Although PCS' argument focuses narrowly on the wording of the Notice of Award, Missouri law holds that, in interpreting a particular contractual provision, we must interpret the agreement as a whole. "This Court will construe a contract as a whole so as not to render any terms meaningless. A construction that gives a reasonable meaning to each term and harmonizes all provisions is preferred over a construction that renders some provisions without function or sense." *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 229 (Mo. banc 2013) (quoting *State ex rel. Riverside Pipeline Co., L.P. v. Pub. Serv. Comm'n*, 215 S.W.3d 76, 84 (Mo. banc 2007)). Although PCS urges us to look solely at the wording of the Notice of Award, and its use of the phrase "accepted in its entirety," "[i]n determining the intent of the parties to a contract, we review the terms of a contract as a whole, not in isolation." *U.S. Neurosurgical, Inc. v. Midwest Div.–RMC, LLC*, 303 S.W.3d 660, 665 (Mo.App. W.D.2010) (en banc) (citation and internal quotation marks omitted).

The RFP specifies that "[a] binding contract shall consist of . . . the RFP [and any] amendments thereto, . . . the contractor's proposal . . ., and . . . [the Purchasing Division's] acceptance of the proposal by 'notice of award.' " Thus, the RFP is as much a part of the contract as the Notice of Award.

The RFP distinguishes between its *mandatory* requirements, and additional "optional products and services" which a bidder may choose to offer. The RFP plainly contemplates that the State may choose *not* to procure the optional services, since it explicitly provides that "[t]he State of Missouri reserves the right to subjectively evaluate the offeror's proposed optional products and services and prices." At the same time, the RFP provisions specific to this procurement state that "[t]he award shall be made on an all or none basis." [5]

Thus, the RFP contemplated that bidders might propose both mandatory and optional services, and that the State might choose not to procure the optional services; yet the State could accept a bidder's proposal only "on an all or none basis." The only way to interpret these provisions together is to read the requirement for "all or none" acceptance to refer *only* to the mandatory services required by the RFP. Under this reading of the RFP, the Purchasing Division could accept "all" of a bidder's proposal without accepting the optional services. The Purchasing Division's Notice of Award, which accepted Securus'

---

telephone calls from a DOC facility, by the persons receiving those calls, or by persons funding prepaid accounts for offender telephone calls. None of the parties argue that our analysis should be affected by the fact that this contract does not require direct State expenditures; we therefore do not address the point.

5. The standard terms attached to the RFP provide that the Purchasing Division "reserves the right to make awards by item or group of items, or an all or none basis." To the extent that the Purchasing Division's standard terms and conditions conflict with the provision—specific to this procurement— mandating that the contract be awarded "on

an all or none basis," the procurement-specific provision controls. *Cf. House of Lloyd, Inc. v. Dir. of Revenue*, 824 S.W.2d 914, 924 (Mo. banc 1992) ("When there is a conflict between the typewritten and preprinted language in a contract, the typewritten will prevail as the true intent of the parties"), overruled on other grounds, *Sipco, Inc. v. Dir. of Revenue*, 875 S.W.2d 539 (Mo. banc 1994); *Five Star Quality Care–MO, LLC v. Lawson*, 283 S.W.3d 811, 815 (Mo.App. W.D.2009) ("When a provision of a contract deals with a specific situation, it will prevail over a more general provision if there is ambiguity or inconsistency between them.").

proposal "in its entirety," was issued against this background. Consistent with the RFP, the language of the Notice of Award is naturally read to refer only to Securus' proposal addressing the *mandatory* services required by the RFP, not the *optional* services.

■ Even if we read the phrase "accepted in its entirety" to be ambiguous, reversal would not be required. A contract is ambiguous "if it is susceptible to more than one interpretation." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012). If the ambiguity cannot be resolved by reference to the contract itself, resolution of the ambiguity may then become a factual issue, for resolution by the finder of fact. *Id.*

■ "Equivocal terms in a contract may be interpreted in light of all the surrounding circumstances, including applicable customs and usages, as well as the contracting parties' own interpretation of the contract." *Graham v. Goodman*, 850 S.W.2d 351, 355 (Mo. banc 1993). In addition, Missouri courts have held that "to determine the character of a specific contract provision, it is the intent of the parties and the special circumstances of the case which control; not the contract terminology." *Goldberg v. Charlie's Chevrolet, Inc.*, 672 S.W.2d 177, 179 (Mo.App. E.D. 1984).

> In order to determine the intent of the parties, it is often necessary to consider not only the contract between the parties, but subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds,

and other external circumstances that cast light on the intent of the parties. *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995) (internal quotation marks omitted); *see also, e.g., Finova Capital Corp. v. Ream*, 230 S.W.3d 35, 49 (Mo.App. S.D.2007).

■ In this case, one of the critical "surrounding circumstances" is that the contract at issue was awarded by a governmental agency subject to the competitive bidding requirements of chapter 34, RSMo. The controlling statutes require that "[a]ll bids shall be based on standard specifications wherever such specifications have been approved by the commissioner of administration," as they were in this case. § 34.040.4, RSMo. If an individual proposal varies from these standard specifications, the proposal must be rejected if the variance is material, meaning that "it gives a bidder a substantial advantage or benefit not enjoyed by other bidders." *State ex rel. Stricker v. Hanson*, 858 S.W.2d 771, 776 (Mo.App. W.D.1993) (citation and internal quotation marks omitted).

> This test ... reflects a belief that *every element which enters into the competitive scheme should be required equally for all and should not be left to the volition of the individual aspirant* to follow or to disregard and thus to estimate his bid on a basis different from that afforded the other contenders.

*Id.* (emphasis added; citations and internal quotation marks omitted).

The evidence indicates that the parties were aware that it would be unfair, and potentially unlawful, for the Purchasing Division to purchase an optional service offered by one bidder at an additional cost,[6] when other bidders were not given

---

**6.** Different considerations may apply where one bidder submits a proposal which satisfies

the mandatory minimum requirements of an RFP, but proposes to supply additional goods

the opportunity to bid on that service, and where the RFP did not alert all bidders that the Purchasing Division intended to buy that optional service. PCS representatives had a meeting with a Purchasing Division official, prior to the submission of bids, in which this precise issue was discussed. PCS' understanding after that meeting was that the Purchasing Division would use the "Best and Final Offer" (or "BAFO") process to solicit comparable proposals from all bidders, if it desired to purchase any optional service which only some of the bidders had proposed.

It is also significant that the circuit court found that the State did not evaluate the optional services proposed by Securus, either in its objective or subjective evaluations, and conducted no investigation as to whether those optional services could be purchased at a lower cost from another vendor.

The reading which PCS now seeks to place on the phrase "accepted in its entirety" would be at odds with the legal requirements to which the Purchasing Division is subject, and would be inconsistent with the manner in which the Purchasing Division evaluated the competing proposals, and with the representations it made to PCS, before bids were submitted, as to how it intended to proceed. The circuit court did not err in accepting an alternative reading of the phrase, which is consistent with other provisions of the contract, with chapter 34's competitive-bidding requirements, and with the parties' actions and statements before the contract was awarded.[7]

We also cannot ignore that PCS proposes a reading of the phrase "accepted in its entirety" (to include the optional services Securus offered to provide at an additional cost) in order to have the contract *declared unlawful*. This approach is inconsistent with Missouri law. Rather than adopting a reading of ambiguous contract language which renders the agreement *unlawful*, the Missouri Supreme Court has made clear that, "[w]here an agreement is susceptible to two constructions, one of which renders the contract invalid and the other sustains its validity, the latter construction is preferred." *Perbal v. Dazor Mfg. Corp.*, 436 S.W.2d 677, 689 (Mo.1969) (citation omitted). As the Eastern District of this court held,

> [c]ourts do not favor the destruction of agreements. . . . We must, therefore, construe each term of a contract to avoid an effect which renders other terms meaningless or illusory. Accordingly, when a contract provision is susceptible to two interpretations, only one of which is reasonable, the reasonable interpretation should be given effect.

*Parker v. Pulitzer Pub. Co.*, 882 S.W.2d 245, 250 (Mo.App. E.D.1994) (citations and internal quotation marks omitted); *see*

---

or services which were not specified, within its "base" price. That situation is not presented here.

7. We recognize that, after the contract was awarded to Securus, the DOC indicated its desire to have the optional services implemented, and Securus made "full speed" preparations to have the optional services available when it assumed responsibility for the telephone system in mid-October 2011. DOC is not the contracting authority, however, and a representative of the Office of Administration testified that a contract amendment (which was never executed) would be necessary in order to procure the optional services. Moreover, it is undisputed that the optional services were never implemented, and that Securus has charged only its base $.05 per-minute rate since taking over the contract. The circuit court evidently found, as a factual matter, that the post-award events did not alter its reading of the contract. That conclusion is supported by substantial evidence.

*also City of Malden v. Green,* 779 S.W.2d 354, 356 (Mo.App. S.D.1989).

Given the language of the RFP, the Purchasing Division's statement that Securus' proposal was "accepted in its entirety" must be interpreted to refer solely to the mandatory services specified in the RFP. Even if the Notice of Award is deemed ambiguous, the circuit court's reading of the term is supported by the legal environment within which the Purchasing Division operates, by the Purchasing Division's pre-award representations to PCS, and by the manner in which the proposals were evaluated. Point I is denied.

■■■ In its second Point, PCS argues that it was unlawful for the Purchasing Division to accept Securus' cell phone detection and interruption proposal, because Securus' proposal would have required the Office of Administration to improperly delegate contracting authority to Securus. Given that we have affirmed the circuit court's determination that the State did not procure any of the optional services Securus proposed, PCS' second Point is moot.

### III.

■■■ In its final Point, PCS argues that the contract is void because the State failed to consider an important aspect of Securus' proposed pricing—its $6.95 per-transaction fee for prepaid accounts—before determining that Securus was the "lowest and best offeror" under § 34.042.3. Securus' proposed a fee of $6.95 each time a customer deposited money into his or her prepaid account. Securus' proposed prepaid account fee was the highest of any of the bidders; one bidder (Talk Telio) proposed no transaction fee at all.

■■■■ "To meet basic standards of due process and to avoid being arbitrary, unreasonable, or capricious, an agency's decision must be made using some kind of objective data rather than mere surmise, guesswork, or 'gut feeling.'" *Mo. Nat'l Educ. Ass'n v. Mo. State Bd. Of Educ.,* 34 S.W.3d 266, 281 (Mo.App. W.D.2000) (citation omitted). "Moreover, an agency which completely fails to consider an important aspect or factor of the issue before it may also be found to have acted arbitrarily and capriciously." *Barry Serv. Agency Co. v. Manning,* 891 S.W.2d 882, 892 (Mo.App. W.D.1995) (citation omitted).

As PCS points out, the trial court found that the inter-agency evaluation committee "did not subjectively weigh the amount of pre-paid account transaction fees," meaning that "no bidder was given more or less points based on the amount of fees they charged." The trial court also found that, if Securus' prepaid account fees had been considered as part of the *objective cost evaluation,* Talk Telio, rather than Securus, would have been awarded the contract. Based on these findings, PCS argues that we should find the contract award to be arbitrary and capricious based on the Purchasing Division's "failure to consider *in any manner* these fees." (Emphasis added.)

The circuit court rejected PCS' claim concerning the prepaid account fees because in the RFP the State "reserve[d] the right" to evaluate these fees as part of its subjective evaluation, and therefore "it was not obligated to exercise that right for the base contract to be valid." We share PCS' concern with the trial court's stated rationale for rejecting PCS' prepaid account fee claim. Taken to its extreme, the circuit court's decision could be read to permit a contracting agency to give itself the discretion to refuse to consider material aspects of the bids submitted to it, even if the various bids could be compared accurately and quantitatively. We question whether the procurement statutes give contracting

agencies *carte blanche* to define their evaluation criteria in any manner they choose, even if their specified criteria ignore important aspects of the contract proposals submitted to them.

 We need not definitively resolve that issue, however, because we are entitled to "affirm the judgment of the trial court on any ground supported by the record." *Clayton v. Sarratt,* 387 S.W.3d 439, 445 (Mo.App. W.D.2013) (citation and internal quotation marks omitted).

Unlike PCS, we do not read the trial court's judgment as finding that the evaluation committee failed to consider Securus' prepaid account transaction fees "in any manner." Instead, the circuit court found that the Purchasing Division did not consider Securus' prepaid transaction fees in its objective cost evaluation, and that the evaluation committee did not *assign a numerical point value* to the prepaid account fees in its subjective evaluation.

The trial court's findings are fully consistent with the evidence that the evaluation committee *did* consider the fees as part of its subjective evaluation. The committee's report of its subjective evaluation expressly identifies prepaid transaction fees as one of the factors which guided its subjective evaluation. The report states:

> The subjective evaluation of method of performance, system functionality and expertise of personnel was based on the following areas of the RFP:
>
> . . . .
>
> (8) Other required costs (pre-paid account set-up fee, international calls, and payphone calls): Finally, the committee evaluated each offeror's identified firm fixed costs associated with pre-paid account set-up fee, international calls, and payphone calls.

In the section of the report specifically discussing the subjective evaluation of Securus' proposal, the report specifically notes that "Securus' other proposed required costs were high compared to other offerors."

As the trial court found, no specific points were awarded, or subtracted, in the subjective evaluation based on a particular bidders' proposed prepaid account fees. However, Theresa Roedel, a member of the evaluation committee, explained that *none* of the eight criteria which the committee used to conduct its subjective evaluation were assigned a specific point value. Instead, she agreed that, in determining a particular bidder's score on the Method of Performance factor, "there was not a, like a chart listed with 80 points and people were subtracting, but the group essentially, after discussing it, came up with a number for each one." Ms. Roedel's testimony, and the committee's report, make clear that the prepaid account transaction fees proposed by each bidder were part of this "gestalt" analysis.

The RFP specifically advised bidders that prepaid account fees would be considered as part of the *subjective* evaluation of bids, *not* as part of the objective cost evaluation:

> If the offeror provided pricing for the pre-paid account set-up fee, the state reserves the right to subjectively evaluate the proposed pre-paid set-up fee as part of the proposed method of performance, solution functionality, and expertise of personnel since estimates of the number of pre-paid account transactions [is] unable to be determined.

The Purchasing Division did not arbitrarily exclude prepaid account fees from its objective cost evaluation. The RFP states that the number of prepaid account transactions could not be confidently estimated. Unlike collect-call fees—which are assessed on every call—the prepaid account fees are only assessed when some-

one deposits money into a prepaid account. As the State points out in its brief, if per-transaction fees are raised, users may respond by making fewer, larger deposits into their accounts to minimize the fees incurred (just as a person may respond to higher per-transaction fees for using an Automated Teller Machine ("ATM") by making fewer, but larger, cash withdrawals from their bank account). Further, unlike the other bids, Securus' proposal specified that it would not charge *any* fee for prepaid account transactions by check or money order; only transactions conducted with a credit card would be assessed the $6.95 fee. The record does not reflect the relative percentage of prepaid account transactions during PCS' tenure that were conducted by check or money order, rather than by credit card; therefore, the number of prepaid account transactions to which Securus' fee would apply is unknown. Moreover, there is every possibility that users who intended to fund a prepaid account by credit card might instead choose to pay by check when faced with a $6.95 fee for credit-card transactions.

Although PCS characterizes Securus' per-transaction prepaid account fees as a multi-million dollar cost which the State simply ignored, in reality the monetary impact of the prepaid account fees would be difficult, if not impossible, to evaluate on an objective basis. Securus' proposed fee does not apply to what may be a large percentage of such transactions, and it is quite conceivable that individuals faced with higher transaction costs will take actions to minimize the fees they incur, or avoid incurring those fees altogether. Therefore, based upon the information available to the State, it did not act arbitrarily or capriciously in addressing the prepaid account costs as part of its non-mathematical subjective evaluation. Point III is denied.

## Conclusion

The circuit court's judgment is affirmed.

All concur.